IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| MEGAN L. SHINAL AND ROBERT J. SHINAL, HER HUSBAND, | : | No. 31 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellants | : | Court at No. 1714 MDA 2014 dated |
| | : | August 25, 2015, reconsideration |
| | : | denied October 28, 2015, Affirming the |
| v. | : | Judgment of the Montour County Court |
| | : | of Common Pleas, Civil Division, dated |
| | : | September 29, 2014 at No. 588-CV- |
| STEVEN A. TOMS, M.D., | : | 2009. |
| | : | |
| Appellee | : | ARGUED: November 2, 2016 |

*Justice Wecht delivers the Opinion of the Court. Justices Donohue and Dougherty join the opinion in full. Justice Todd joins the opinion, except with respect to Part II(A)(2). Justice Mundy joins Part II(A) of the opinion in full.*

## OPINION

**JUSTICE WECHT**                                                **DECIDED: June 20, 2017**

In this medical malpractice action premised upon lack of informed consent, we address whether the trial court erred in refusing to strike prospective jurors for cause based upon their relationships to the case through their employer or their immediate family member's employer. We conclude that the trial court did not err in this regard. However, we conclude further that the trial court committed an error of law when it instructed the jury to consider information provided by the defendant surgeon's qualified staff in deciding the merits of the informed consent claim. Because a physician's duty to provide information to a patient sufficient to obtain her informed consent is non-

delegable, we reverse the Superior Court's order affirming the judgment entered in favor of the defendant, and we remand for a new trial.

## I. Background

Geisinger Health System, situated primarily in Montour County, is a large, integrated health system comprised of, *inter alia*, hospitals, physician groups, medical clinics, surgical centers, and a health insurance provider. Geisinger Health System's flagship hospital is Geisinger Medical Center, located in Danville, Montour County. Geisinger Clinic, also part of Geisinger Health System, is the business entity employing physicians within Geisinger Health System. Geisinger Health System and its related business entities employ about 12,000 people, making it the largest employer in Montour County. Reproduced Record (R.R.) 208a. Steven A. Toms, M.D., is the Director of the Department of Neurosurgery at Geisinger Medical Center, and is employed by Geisinger Clinic as a neurosurgeon.

On November 26, 2007, Megan L. Shinal and Dr. Toms met for a twenty-minute initial consultation to discuss removing a recurrent non-malignant tumor from the pituitary region of Mrs. Shinal's brain. Years earlier, a surgeon operated to extract the tumor by accessing it through the nose, but was unable to remove all of it. The residual portion of the tumor remained and increased in size until it extended into vital structures of the brain, jeopardizing Mrs. Shinal's eyesight and her carotid artery, causing headaches, and threatening to impact Mrs. Shinal's pituitary and hormone function. If left untreated, the tumor would eventually become life-threatening.

According to Dr. Toms' subsequent trial testimony, the November 26, 2007 meeting entailed a discussion of Mrs. Shinal's goals and expectations in life and the risks of different approaches to surgery, including possible damage to the nearby carotid artery and the optic nerve. In Dr. Toms' recollection, Mrs. Shinal stated that she

wanted to "be there" for her child, who was then nine years old. R.R. 503a. Dr. Toms understood Mrs. Shinal to mean that "she wanted me to push forward if I got in a situation where I thought I could [remove all of the tumor] with a reasonable risk." R.R. 503a. Dr. Toms testified that he reviewed with Mrs. Shinal the alternatives, risks, and benefits of total versus subtotal resection, and shared with Mrs. Shinal his opinion that, although a less aggressive approach to removing the tumor was safer in the short term, such an approach would increase the likelihood that the tumor would grow back. Although he was unable to recall many of the specifics about his conversation with Mrs. Shinal, Dr. Toms testified that he advised Mrs. Shinal that total surgical resection offered the highest chance for long-term survival. R.R. 503-510a. By the end of the visit, Mrs. Shinal had decided to undergo surgery. However, the surgical approach had not yet been determined. R.R. 513a.

Shortly thereafter, on December 19, 2007, Mrs. Shinal had a telephone conversation with Dr. Toms' physician assistant. Mrs. Shinal later testified that she asked the physician assistant about scarring that would likely result from surgery, whether radiation would be necessary, and about the date of the surgery. The medical record of this telephone call indicated that Dr. Toms' physician assistant also answered questions about the craniotomy incision. On January 17, 2008, Mrs. Shinal met with the physician assistant at the Geisinger Medical Center's Neurosurgery Clinic. The physician assistant obtained Mrs. Shinal's medical history, conducted a physical, and provided Mrs. Shinal with information relating to the surgery. Mrs. Shinal signed an informed consent form.[1]

---

[1] This form acknowledged that Mrs. Shinal gave Dr. Toms permission to perform "a resection of recurrent craniopharyngioma," and identified the risks of the surgery as including "pain, scarring, bleeding, infection, breathing problems, heart attack, stroke, injury and death." Tr. Ct. Op. at 4. The form also represented that Mrs. Shinal had discussed the "advantages and disadvantages of alternative treatments," that "[t]his (continued...)

At trial, Mrs. Shinal was unable to recall being informed of the relative risks of the surgery, other than coma and death. Mrs. Shinal testified that, had she known the alternative approaches to surgery, *i.e.*, total versus subtotal resection, she would have chosen subtotal resection as the safer, less aggressive alternative.

On January 31, 2008, Mrs. Shinal underwent an open craniotomy total resection of the brain tumor at Geisinger Medical Center. During the operation, Dr. Toms perforated Mrs. Shinal's carotid artery, which resulted in hemorrhage, stroke, brain injury, and partial blindness.

On December 17, 2009, Mrs. Shinal and her husband, Robert J. Shinal (collectively "the Shinals"), initiated this medical malpractice action in the Court of Common Pleas of Montour County, alleging that Dr. Toms failed to obtain Mrs. Shinal's informed consent for the January 31, 2008 surgery.[2] According to the Shinals'

_____

(...continued)

form has been fully explained to me," that Mrs. Shinal understood the form's contents, that Mrs. Shinal had the opportunity to ask questions, and that Mrs. Shinal had sufficient information to give her informed consent to the operation. *Id.* The form did not purport to address the specific risks of total versus subtotal resection.

[2]     The Medical Care Availability and Reduction of Error (MCARE) Act defines informed consent as follows:

> (a) Duty of physicians.—Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

> > (1) Performing surgery, including the related administration of anesthesia.

> > > * * *

> (b) Description of procedure.—Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks

(continued...)

complaint, Dr. Toms failed to explain the risks of surgery to Mrs. Shinal or to offer her the lower risk surgical alternative of subtotal resection of the benign tumor, followed by radiation. The Shinals initially named as defendants Geisinger Medical Center, Geisinger Clinic, and Dr. Toms. The parties agreed to bifurcate the issues of liability and damages. The liability phase of the trial was to address solely the issue of whether Dr. Toms obtained Mrs. Shinal's informed consent before surgery.

Prior to jury selection, the Shinals moved to strike all potential jurors who were either employed or insured by, or who had family members employed or insured by, any Geisinger entity. On February 12, 2013, the trial court granted in part and denied in part the Shinals' motion, directing that prospective jurors who were employed by named defendants Geisinger Medical Center or Geisinger Clinic, or who had family members residing in the same house who were so employed, would be stricken for cause. The trial court immediately attempted to select a jury. However, after numerous prospective jurors were disqualified, the court aborted the selection process and postponed the trial. The Shinals moved for a change of venue, which the trial court denied.

On May 28, 2013, the trial court granted a motion for partial summary judgment in favor of Geisinger Medical Center and Geisinger Clinic, because the duty to obtain

---

(...continued)
> and alternatives that a physician acting in accordance with accepted medical standards of medical practice would provide.

* * *

> (d) Liability.—
>
>> (1) A physician is liable for failure to obtain the informed consent only if the patient proves that receiving such information would have been a substantial factor in the patient's decision whether to undergo a procedure set forth in subsection (a).

40 Pa.C.S. § 1303.504.

Mrs. Shinal's informed consent belonged solely to Dr. Toms, not to Dr. Toms' employer or the employer's agents. *See Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232, 1239 (Pa. 2002) (holding that a medical facility lacks control over the manner in which a physician performs his/her duty to obtain informed consent, and cannot be vicariously liable for breach of that duty).

On April 8, 2014, the trial court amended its prior order of February 12, 2013, in an attempt to comply with the two plurality opinions of an intervening Superior Court decision. *See Cordes v. Assoc. of Internal Medicine*, 87 A.3d 829, 843-45 (Pa. Super. 2014) (Opinion in Support of Reversal ("OISR") by Wecht, J.) (requiring, *inter alia*, the exclusion of a prospective juror based upon a presumption of prejudice arising from the juror's employment by the parent company of a named corporate defendant); *id.* at 869-70 (OISR by Donohue, J.) (requiring, *inter alia*, the exclusion of a prospective juror based upon the juror's perception of the financial impact the verdict could have on his employer, the parent company of a named defendant). The Shinals invoked *Cordes* and moved for the disqualification for cause of any juror employed by any Geisinger entity. The trial court denied this motion, concluding that *Cordes* did not require *per se* disqualification based upon an employment relationship with a non-party Geisinger entity. Rather, the trial court undertook to inquire into whether "prospective jurors or their close family members have a close financial or situational relationship which may give rise to an appearance or prospect of partiality or bias," and stated that it would "consider whether to disqualify such prospective jurors" on an individual basis. R.R. 178a.

On April 15, 2014, the trial court began a second attempt at jury selection. The trial court informed the parties that each had four peremptory strikes to use on the main jury panel and one to use for the alternate jurors. In accord with its April 8, 2014 order,

the trial court conducted an individualized inquiry of all prospective jurors, asking whether the juror or his/her close family members (1) knew, or had been patients of, Dr. Toms; (2) were employed by a Geisinger entity; (3) if employed by a Geisinger entity, whether the prospective juror perceived that entity to be the same entity employing Dr. Toms; and, if so, (4) whether the prospective juror perceived that a verdict against Dr. Toms would have an adverse financial impact upon that Geisinger entity. The trial court also asked each juror whether he or she could render a fair and impartial verdict.

During *voir dire*, the Shinals moved to strike the following prospective jurors for cause, asserting that they or their immediate family member's close financial or situational relationships should cause the court to presume prejudice: Linda M. Woll, Denny Ackley, Louise A. Schiffino, and W. Stephen Nagle, an alternate juror. Woll was an administrative secretary at the Geisinger sleep labs. Ackley's wife worked for thirty-five years as an administrative assistant in a pediatrics department for a Geisinger entity. Schiffino was a customer service representative for Geisinger Health Plan. Nagle was a retired physician assistant who had previously worked at a Geisinger entity, but never in Dr. Toms' department. Additionally, Nagle's son worked as a night security officer for a Geisinger entity.

All of the four prospective jurors indicated that they believed they would be fair and impartial, that they did not personally know Dr. Toms, that Dr. Toms did not medically treat them or their close family members, and that they did not believe that a verdict against Dr. Toms would negatively impact their employer or their close family member's employer. The trial court therefore denied the Shinals' motion to dismiss these prospective jurors for cause, finding that the relationships presented were more attenuated than those at issue in *Cordes*, and that the jurors' assurances of impartiality rendered them fit to serve on the jury. Accordingly, the Shinals exercised three of their

four peremptory challenges to excuse Woll, Ackley, and Schiffino from the main jury panel,[3] and exercised their sole peremptory challenge for the alternate jurors on Nagle.

Following the presentation of evidence, the trial court instructed the jury with regard to Dr. Toms' duty to obtain informed consent from Mrs. Shinal as follows: "[I]n considering whether [Dr. Toms] provided consent to [Mrs. Shinal], you may consider any relevant information you find was communicated to [Mrs. Shinal] by any qualified person acting as an assistant to [Dr. Toms]." R.R. 673a. During deliberations, the jury asked the court whether information conveyed by physician assistants could satisfy informed consent requirements. In response, the trial court essentially repeated its prior instruction. R.R. 693a.

On April 21, 2014, the jury returned a verdict in favor of Dr. Toms. On May 1, 2014, the Shinals moved for post-trial relief, asserting two claims of error that are relevant to this appeal. First, the Shinals asserted that the trial court erred in failing to strike for cause Woll, Ackley, Schiffino, and Nagle because of their employment, or employment of close family members, with a Geisinger entity. Second, the Shinals argued that the trial court erred in its informed consent jury instructions. Specifically, the Shinals asserted that the trial court improperly instructed the jury that the jury could consider any relevant information communicated to Mrs. Shinal by any qualified person acting as an assistant to Dr. Toms. The trial court denied post-trial relief.

The Shinals appealed to the Superior Court, which affirmed. The Superior Court first addressed whether the trial court should have stricken Woll, Ackley, Schiffino, and Nagle for cause. According to the Shinals, the trial court should have presumed prejudice based upon the four prospective jurors' financial and situational relationships

---

[3]     Additionally, the Shinals used their sole remaining peremptory challenge on a prospective juror who worked as a healthcare consultant.

with Geisinger entities. In support of their argument of trial court error, the Shinals asserted that the trial court's failure to excuse the four prospective jurors for cause forced the Shinals to exercise and exhaust their peremptory challenges on those jurors, leaving them unable to strike other jurors whom the Shinals believed might be biased in favor of Dr. Toms.

The Superior Court rejected this argument. The Superior Court observed that the Shinals' argument was premised upon *Cordes*, and that the trial court endeavored to comply with *Cordes* during jury selection. However, the Superior Court held that *Cordes* was not binding precedent because no opinion garnered a majority of the court in that case. Instead, the Superior Court relied upon *McHugh v. Proctor & Gamble Paper Products Co.,* which established that the trial court should presume a likelihood of prejudice based upon "a close relationship, familial, financial, or situational, with the parties, counsel, victims or witnesses." 776 A.2d 266, 270 (Pa. Super. 2001). Engaging in an independent review of the record, the Superior Court found that none of the challenged prospective jurors had such a close relationship with the litigants. Rather, the Shinals premised their assertion of prejudice upon situational relationships with Dr. Toms' employer, a non-party. The Superior Court declined to expand the range of disqualifying relationships beyond those recognized in *McHugh.*[4]

The Superior Court also rejected the Shinals' assertion that, because they were forced to exhaust their peremptory challenges, they were unable to remove seated jurors whom the Shinals believed to be biased in favor of Dr. Toms due to their own situational relationships with Geisinger. According to the Superior Court, the Shinals waived this argument by failing to make a timely, specific objection to the trial court that

---

[4] Judge Lazarus dissented, for the reasons expressed by the two plurality opinions in support of reversal in *Cordes.*

they had too few peremptory challenges, and by failing to request additional peremptory challenges. The Superior Court acknowledged that the Shinals raised this objection in their pretrial motion to strike, at a time when Geisinger Medical Center and the Geisinger Clinic were defendants. However, the Superior Court held that the Shinals nevertheless waived this claim by failing to renew their motion to strike following the dismissal of the Geisinger entities.

The Superior Court further rejected the Shinals' argument that the trial court's informed consent charge, which permitted the jury to consider information provided by Dr. Toms' physician assistant to Mrs. Shinal, was erroneous and prejudicial. The Superior Court relied upon two of its prior cases to opine that information communicated to a patient for purposes of obtaining informed consent may be conveyed by a qualified professional acting under the attending doctor's supervision.[5]

## II. Discussion

### A. Juror Challenge For Cause

The first issue before us is whether the Shinals were entitled to strike for cause prospective jurors with familial, situational, or financial relationships with Dr. Toms' employer, whether direct or indirect, when Dr. Toms' allegedly tortious conduct occurred in the course of his employment. First, we define our relevant standard of review. Then, we apply that standard to the facts presented.

### 1. Standard of Review

According to the Shinals, the denial of a for-cause challenge premised upon a juror's close familial, financial, or situational relationship with the parties, counsel, victims, or witnesses, raises a question of law, as to which our standard of review is *de*

---

[5] *See Foflygen v. Allegheny General Hosp.*, 723 A.2d 705 (Pa. Super. 1999); *Bulman v. Myers*, 467 A.2d 1353 (Pa. Super. 1983).

*novo* and our scope of review plenary. *McHugh*, 776 A.2d at 270. Dr. Toms differs, asserting that disqualification of a juror for cause is a decision for the trial court, which will not be reversed absent a palpable abuse of discretion. *Commonwealth v. Briggs*, 12 A.3d 291, 332-33 (Pa. 2011); *Commonwealth v. Stevens*, 739 A.2d 507, 521 (Pa. 1999).

"One of the most essential elements of a successful jury trial is an impartial jury." *Bruckshaw v. Frankford Hosp. of City of Phila.*, 58 A.3d 102, 109 (Pa. 2012); *see Colosimo v. Pa. Elec. Co.*, 518 A.2d 1206, 1209 (Pa. 1986). We protect that impartiality through the *voir dire* process, vetting potential jurors to discern bias or relationships to the parties, lawyers, or matters involved. *Bruckshaw*, 58 A.3d at 110; *Commonwealth v. Marrero*, 687 A.2d 1102, 1107 (Pa. 1996) ("The purpose of *voir dire* is to ensure the empaneling of a fair and impartial jury capable of following the instructions of the trial court."); *Colosimo*, 518 A.2d at 1209; *see* Pa.R.C.P. 220.1-221 (pertaining to *voir dire* and the use of peremptory challenges). Importantly, it is not simply the fact of partiality, but also the appearance of partiality or bias, that the trial court must consider. *See Commonwealth v. Stewart*, 295 A.2d 303, 306 (Pa. 1972) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness.")).[6]

Challenges for cause are essential means by which to obtain a jury that in all respects is impartial, unbiased, free from prejudice, and capable of judging a case

---

[6]     *Accord Seeherman v. Wilkes-Barre Co.*, 99 A, 174, 176 (Pa. 1916) ("It [is] certainly desirable that the cause should be tried by persons free even from the suspicion of partiality."); *Hufnagle v. Del. & Hudson Canal Co.*, 76 A. 205, 206 (Pa. 1910) ("[N]o person should be permitted to serve on a jury who stands in any relation to a party to the cause that would carry with it *prima facie* evident marks of suspicion of favor. . . ." (internal quotation marks omitted)).

based solely upon the facts presented and the governing law.  At the trial of Aaron Burr, Chief Justice John Marshall explained the principle:

> Why is it that the most distant relative of a party cannot serve upon his jury? Certainly the single circumstance of relationship, taken in itself, unconnected with its consequences, would furnish no objection.  The real reason of the rule is, that the law suspects the relative of partiality; suspects his mind to be under a bias, which will prevent his fairly hearing and fairly deciding on the testimony which may be offered to him.  The end to be obtained is an impartial jury; to secure this end, a man is prohibited from serving on it whose connexion with a party is such as to induce a suspicion of partiality.  The relationship may be remote; the person may never have seen the party; he may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice.

*United States v. Burr*, 25 Fed. Cas. 49, 50  (C.C. D.Va. 1807).

At common law, for-cause challenges were divided into four classes: "*Propter honoris respectum*, out of respect of rank or honor; *propter defectum*, on account of some defect; *propter delictum*, on account of crime; and *propter affectum*, on account of affection or prejudice."  *Butler v. Greensboro Fire Ins. Co.*, 145 S.E. 3, 4 (N.C. 1928) (emphasis added).[7]  Challenges *propter affectum* operated to bar the seating of a juror employed by a party to the litigation due to the appearance of partiality arising from the party's potential control over the juror.  *See Cummings v. Gann*, 52 Pa. 484, 487 (1866) ("All the authorities seem to be, that where the objection is not on account of relationship, to require it to be shown as a ground of principal challenge *propter*

---

[7]  *See also Harrisburg Bank v. Forster*, 1839 WL 3578, at *3 (Pa. 1839) (identifying the four common-law classes of for-cause challenges); *Commonwealth v. Lesher*, 1827 WL 2776, at *7 (Pa. 1827) (same).

*affectum*, as between the party and juror, that the former holds a position in which he might exercise a control over the latter.").[8] As this Court explained long ago:

> The law, in every case, is scrupulous to prevent even the possibility of undue bias; it does not deal with a juror as with a witness; admit him, though it doubts him; the slightest ground of prejudice is sufficient. The prejudice itself need not be made out; the probability of it is enough. One related, though by marriage only, as remotely as the ninth degree, to the defendant or the prosecutor, may be challenged off the jury for that cause. Any one, who, in any possible way, no matter how honestly, has been warped by any preconceived opinion which may affect his verdict, or has made up his mind what verdict he is to give, and declared it, is excluded. Nothing in the law can well be more extensive than this right of challenge *propter affectum*.

*Lesher*, 1827 WL 2776, at *2.[9]

---

[8] *See also Harrisburg Bank*, 1839 WL 3578, at *3 ("A juror ought not to stand in any relation to the party, arising either from contract or otherwise, that would carry with it *prima facie* evident marks of suspicion of favor."); *Hufnagle v. Del. & Hudson Canal Co.*, 1902 WL 4348, at *1 (Pa. Com. Pl. 1902) ("Jurors may be challenged *propter affectum*, for suspicion of bias or partiality. This may be either a principal challenge or to the favour. A principal challenge is such where the cause assigned carries with it *prima facie* evident marks of suspicion either of malice or favour: as that he is the party's master servant, counsellor, steward or attorney." (quoting Sir William Blackstone, 3 Comm. 363)).

[9] *See also In United States v. Polichemi*, 201 F.3d 858, 864 (7th Cir. 2000) ("From that time to the present, the federal courts have included among the reasons supporting a challenge for cause the kinds of presumptive sources of bias to which the Chief Justice referred [in *Burr*]."); *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (recognizing three possible grounds for challenges for cause: those based upon actual bias, those based upon implied bias, and those based upon "inferable" bias); *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) ("Actual bias can come to light during *voir dire* in two ways: by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed."); *United States v. Dellinger*, 472 F.2d 340, 367-69 (7th Cir. 1972) (noting that prospective jurors may be unacceptably biased for a variety of reasons, and, because they themselves are often unaware of these actual biases, it is essential to explore their backgrounds and attitudes in order to uncover them); *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968) ("At common law, jurors were challengeable on principle for bias for partiality due to kinship, interest, former jury service in the same cause, or because the prospective juror was a master, servant, counselor, steward, or of the same society or corporation . . . . Not only have these common law grounds for causal challenge (continued...)

As a general matter, the test for determining whether a prospective juror is disqualified is "whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor." *Commonwealth v. Colson*, 490 A.2d 811, 818 (Pa. 1985).[10] The trial judge must determine whether the juror is able to put aside any biases or prejudices upon proper instruction from the court. *Commonwealth v. Bridges*, 757 A.2d 859, 873 (Pa. 2001); *Colson*, 490 A.2d at 818; *Commonwealth v. Drew*, 459 A.2d 318 (Pa. 1983).

Generally, "[t]he decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." *Commonwealth v. Koehler*, 737 A.2d 225, 238 (Pa. 1999) (quoting *Commonwealth v. Wilson*, 672 A.2d 293, 299 (Pa. 1996)); *see Colson*, 490 A.2d at 818; *Commonwealth v. Black*, 376 A.2d 627 (Pa. 1977). However, we have required the trial court to grant a challenge for cause in two scenarios: "when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses" or, alternatively, when the juror "demonstrates a likelihood of prejudice by his or her conduct and answers to questions." *Bridges*, 757 A.2d at 873; *see Wilson*, 672 A.2d at 299; *Colson*, 490 A.2d at 818.

A challenge of a prospective juror for cause may invoke bias that is either implied or actual. Implied bias is presumed as a matter of law based upon special

---

(...continued)
retained their vitality, . . . but to them have been added others from which prejudice or bias may be implied.").

[10] *See Commonwealth v. Bridges*, 757 A.2d 859 (Pa. 2001); *Commonwealth v. Wilson*, 672 A.2d 293 (Pa. 1996); *Commonwealth v. Bighum*, 307 A.2d 255 (Pa. 1973); *Commonwealth v. Gelfi*, 128 A. 77 (Pa. 1925); *Commonwealth v. Minney*, 65 A. 31, 32 (Pa. 1906); *Commonwealth v. Eagan*, 42 A. 374 (Pa. 1899).

circumstances, and "is attributable in law to the prospective juror regardless of actual partiality." *United States v. Wood*, 299 U.S. 123, 134 (1936).[11] In such circumstances, we do not inquire into whether the juror is capable of being objective and rendering a fair and impartial decision. Rather, we require disqualification to avoid the mere appearance of partiality.[12]

The Superior Court has explained that the standard of appellate review differs depending upon whether bias is presumed, as resulting from the juror's close familial, financial, or situational relationship with the parties, counsel, victims, or witnesses, or actual, as revealed by the juror through his or her conduct and answers. In the first scenario, where the presumption of prejudice arises from a prospective juror's close relationship with the parties, counsel, victims, or witnesses, the Superior Court has reviewed the trial court's determination as a question of law, subject to *de novo* review. *Cordes*, 87 A.3d at 834 (OISR, Wecht, J.); *id.* at 865 (OISR, Donohue, J.); *McHugh*, 776 A.2d at 270 & n.3 (holding that "the employer/employee relationship evokes a

---

[11] The same rationale compels the disqualification of a judge when the appearance of partiality in favor of one party over the other is too great for the law to tolerate. *See, e.g., In the Interest of McFall*, 617 A.2d 707, 713 (Pa. 1992) ("Recusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially."); *Cordes*, 87 A.3d at 864, n.2 (OISR, Donohue, J.).

[12] In this context, the United States Supreme Court has explained the concept of presumed prejudice, or implied bias, as follows:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence. The law therefore most wisely says that, with regard to some of the relations which may exist between the juror and one of the parties, bias is implied, and evidence of its actual existence need not be given.

*Crawford v. United States*, 212 U.S. 183, 196 (1909).

presumption of prejudice so significant as to warrant disqualification of employees of a party" as a matter of law, and overturning the trial court's refusal to dismiss for cause). By contrast, in the second scenario, where a juror's prejudice is revealed through his or her conduct or answers, the Superior Court has applied a deferential standard of review, reversing only when the trial court has abused its discretion. *McHugh*, 776 A.2d at 270.

We agree with the Superior Court's distinction. Our review of a trial court's decision to disqualify a juror based upon that juror's relationship with the parties, counsel, victims, or witnesses depends upon whether the relationship is sufficiently close that we presume the likelihood of prejudice under the first scenario, or whether the juror reveals a likelihood of prejudice through conduct and answers to questions under the second scenario. In the first scenario, we will presume prejudice for the purpose of ensuring fairness and will review the trial court's determination for an error of law. *See Briggs*, 12 A.3d at 333 (examining whether to presume prejudice due to relationships between three prospective jurors and the victims or their families).[13] Our review of a question of law is *de novo*, and the scope of our review is plenary. *Bowling v. Office of Open Records*, 75 A.3d 453, 466 (Pa. 2013).

In the second scenario, where the juror's conduct or answers to questions reveal a likelihood of prejudice, we agree with the Superior Court that "much depends upon the answers and demeanor of the potential juror as observed by the trial judge and, therefore, reversal is appropriate only in the case of palpable error." *McHugh*, 776 A.2d

---

[13] *See also Commonwealth v. Jones*, 383 A.2d 874, 877 (Pa. 1978) (holding that a police officer who has a "real relationship" to a criminal case must be excluded from serving on the jury because of the probability that prejudice will result); *Stewart*, 295 A.2d at 306 ("presuming prejudice for the sake of insured fairness" where a prospective juror was the father of the victim).

at 270 (quoting *Commonwealth v. Johnson*, 445 A.2d 509, 512 (Pa. Super. 1982)).[14] We defer to the trial judge because it is he or she that observes the juror's conduct and hears the juror's answers:

[T]he juror appears before [the trial judge, who] sees him and hears what is said; and is able to form his opinion as much from the proposed juror's conduct as from the words which he utters, printed in the record. Hesitation, doubt, and nervousness indicating an unsettled frame of mind, with other matters, within the judge's view and hearing, but which it is impossible to place in the record, must be considered. As it is not possible to bring these matters to our attention, the trial judge's view should be given great weight in determining the matters before him.

*Gelfi*, 128 A. at 79.

As the Superior Court has observed, these two scenarios are not mutually exclusive. *Johnson*, 445 A.2d at 512. A juror may indicate through questioning an inability to be impartial because of a particular relationship with someone involved in the case. *Id.* When a determination of a juror's ability to be impartial depends upon the juror's answers and explanations, we afford the trial court's judgment much weight. Hence, even in the context of presumed prejudice, the trial court retains discretion to explore and assess the relevant relationship presented. *See, e.g., Schwarzbach v. Dunn*, 381 A.2d 1295, 1298 (Pa. Super. 1977) (granting a new trial due to a juror's wife's unexplained employment relationship with counsel because the trial court did not explore the relationship through questioning).

Having established the relevant standard of review, we proceed now to consider the parties' arguments in light of our precedents and the facts presented.

---

[14] *See Commonwealth v. Colon*, 299 A.2d 326, 328 (Pa. Super. 1972); *Commonwealth v. Gelfi*, 128 A. 77, 79 (Pa. 1928) (when a for-cause challenge is based upon the juror's answers and demeanor, "[n]othing short of a palpable abuse of discretion justifies a reversal").

## 2. Analysis

We must resolve whether the trial court erred in determining that the particular relationships implicated in this case were not so close as to require a presumption of prejudice, and whether the prospective jurors' conduct and answers during *voir dire* revealed their partiality.[15] The purportedly disqualifying relationships presented by the four prospective jurors arose because of the jurors' or their family members' past or present employment relationships with a Geisinger entity owned by Geisinger Heath System, where Dr. Toms was also employed by Geisinger Clinic, an entity owned by Geisinger Health System. The parties agree that these employment connections are indirect familial, financial, or situational relationships, but disagree about whether they are sufficiently close so as to require a presumption of prejudice. Whether to presume prejudice is a question of law, as to which our review is *de novo*. However, where a

---

[15] We also granted review of the Superior Court's alternative holding that the Shinals were required to object to the trial court that they had too few peremptory challenges and, relatedly, that the Shinals were required to request additional peremptory challenges. It is undisputed that the Shinals raised their for-cause challenges in their initial pretrial motion to strike. This motion remained pending before the trial court following the dismissal of Geisinger Medical Center and Geisinger Clinic, until the trial court acted on it on April 8, 2014. Once their for-cause challenges were denied and the Shinals utilized their peremptory challenges, there was no need for a separate objection that they had too few peremptory challenges. Such an objection would have been redundant and pointless, as the trial court already had found no merit to the Shinal's motion to excuse for cause, and the Shinals preserved their objection to that decision.

Moreover, it is error for the trial court to force a party to use his or her peremptory challenges on a prospective juror whom the trial court should have excused for cause, when that party exhausts those peremptory challenges prior to the seating of the jury. *Jones*, 383 A.2d at 876; *see also Commonwealth v. Moore*, 340 A.2d 447 (Pa. 1975) (holding that it was harmless error to refuse a for-cause challenge where the party used a peremptory challenge to exclude the prospective juror but did not exhaust its peremptory challenges). Having requested the trial court to disqualify certain jurors for cause, and having exhausted their peremptory challenges, the Shinals have preserved their claim of trial court error concerning denial of their for-cause challenges.

juror's partiality is arguably revealed through answers elicited during *voir dire*, we review the trial court's decision for an abuse of discretion.

The Shinals claim, as they have since the jury selection process began, that the trial court improperly declined to strike for cause Woll, Ackley, Schiffino, and Nagle. According to the Shinals, the indirect familial, financial, and situational employment relationships presented by these jurors place this case squarely within the first scenario articulated in *Bridges*, and require a presumption of prejudice. Acknowledging that Geisinger Medical Center and Geisinger Clinic had been dismissed from the case, the Shinals argue that this is irrelevant because "Geisinger" nominally remained in the case. The Shinals assert that every entity bearing the Geisinger name is part of the same company, and that a claim against an employee of any Geisinger entity for actions committed at work upon Geisinger property and proven by Geisinger witnesses and Geisinger documents necessarily affects Geisinger. Appellant's Brief at 26. Therefore, according to the Shinals, a verdict against Dr. Toms *is* a verdict against Geisinger Health System, the ultimate employer of the four contested jurors or their family members.

Dr. Toms argues that the trial court was not required to presume prejudice because of the jurors' remote, indirect relationships with Dr. Toms through non-party Geisinger entities. Dr. Toms further maintains that the jurors' *voir dire* answers did not indicate actual bias because the jurors stated that they did not believe their employers would be financially impacted by a verdict against Dr. Toms. Although the Shinals focus upon the first scenario articulated in *Bridges*, Dr. Toms asserts that the four jurors were not subject to disqualification under either approach. Both parties assert that *Cordes* controls and supports their position. Although the trial court likewise considered *Cordes* to be controlling and attempted to comply with the OISRs by employing a modified

version of then-Judge, now-Justice Donohue's reasoning, the Superior Court disregarded *Cordes* as a non-precedential plurality opinion.

The presumption of prejudice arises when a juror has a close familial, financial, or situational relationship with a participant in the litigation (*i.e.*, the parties, counsel, victims, or witnesses). *See Bridges*, 757 A.2d at 873. The mere existence of some familial, financial, or situational relationship does not require dismissal in every case. "A remote relationship to an involved party is not a basis for disqualification where a prospective juror indicates during *voir dire* that he or she will not be prejudiced." *Colson*, 490 A.2d at 818.

In determining whether a juror's relationship to the litigation is so sufficiently close that it creates a presumption of prejudice, or so sufficiently remote that it does not, we cannot ignore the suspicions, and the distrust of the resulting jury verdicts, that may arise based upon the nature of the relationship. Jurors should be above suspicion. Close connections suggest bias due to the nature of the tie; if the relationship presents the appearance of impropriety, prejudice is presumed. "The moment the fact of relationship, favor, enmity, prejudice, bias, preconceived opinion, scruple, or interest of a sufficient nature, is made out it removes the juror; nothing further is necessary." *Gelfi*, 128 A. at 78. The presumption of prejudice and the risk of seating a juror with an implied bias animate much of the precedent requiring the trial court to excuse a juror for cause. Even if the juror believes himself or herself able to remain objective and to rule without bias, the relationship may be so close that it appears biased. In such circumstances, the law errs on the side of removal in order to ensure the appearance of an objective jury.

We have required for-cause disqualification when the prospective juror has a relationship to witnesses in a case. *See, e.g., Jones*, 383 A.2d at 877 (holding that a

police officer on active duty at the time of trial belonging to the same police force as the testifying officers is disqualified).[16]   Additionally, the trial court must excuse a prospective juror for cause if the juror is a stockholder in a corporation that has an interest in the matter.  *Seeherman*, 99 A. at 175.  The weight of authority excludes venirepersons who could be suspected of bias due to their business, professional, familial, or social relationships with a participant to the litigation.[17]

---

[16]   *Accord Commonwealth v. Perry*, 657 A.2d 989, 990-91 (Pa. Super. 1995) (holding that the trial court erred in failing to presume prejudice where a juror testified that he had a close personal friendship with the arresting and prosecuting officer and no doubts about the officer's veracity); *Commonwealth v. Fletcher*, 369 A.2d 307, 308-09 (Pa. Super. 1976) (presuming prejudice and finding reversible error in the trial court's failure to disqualify a juror in a robbery and assault case, where the juror was a police officer, was a member of the same police department as the police witnesses, knew three of those witnesses personally, knew the prosecutor trying the matter, and "had experienced personal attacks during the course of performing his duties as a police officer").

[17]   *See Beam v. State*, 400 S.E.2d 327, 328 (Ga. 1991) (holding that it was reversible error to permit a full-time employee of the prosecuting agency's office to serve as a juror because her service "created a substantial appearance of impropriety," and the trial court should have stricken this juror "to preserve public respect for the integrity of the judicial process"); *Gossett v State*, 41 S.E.2d 308 (Ga. 1947) (holding that it was reversible error not to disqualify jurors who held insurance policies from companies employing and paying the attorney who assisted the solicitor general at trial); *State v. Kauhi*, 948 P.2d 1036, 1040 (Haw. 1997) (applying "the appearance of impropriety" or "implied bias" standard to hold that the trial court erred in declining to excuse for cause a prosecutor currently employed in the same office of the prosecutor trying the defendant, despite the juror's assertion of impartiality); *Ward v Commonwealth*, 695 S.W.2d 404 (Ky. 1985) (recognizing that the trial court should have sustained challenges for cause and excused jurors, regardless of their stated lack of bias, where the challenge was premised upon familial relations between several prospective jurors and the Commonwealth's attorney); *State v. Lewis*, 391 So.2d 1156, 1158 (La. 1980) ("If the revealed details of the relationship are such that bias or prejudice may be reasonably implied, a juror may be properly refused for cause."); *Andry v. Cumis Ins. Soc.*, 387 So.2d 1374 (La. App. 4 Cir. 1980) (holding that the right to an impartial jury may require the exclusion of jurors who are connected to the litigation through an insurance company, particularly when the juror expresses the belief that a verdict will affect the juror's own premiums).

On the other hand, remote relationships should be scrutinized by the trial court in order to elucidate the particulars and address the potential appearance of partiality. *Colson, supra* at 818-19. In *Koehler*, 737 A.2d at 238, for example, the trial court discovered during trial that a juror was related to the co-defendant's step-father through her husband's sister. The juror assured the court that her familial relationship would not affect her ability to be a fair and impartial juror. The trial court denied the defendant's request to remove the juror and to replace her with an alternate. On appeal, this Court affirmed, deferring to the trial court's finding that the juror's relationship with the co-defendant was attenuated and that the concerns were ameliorated by the juror's testimonial assertion of impartiality. "Since it is the trial court that was in the best position to assess the credibility of this juror, . . . and since a court may properly refuse to excuse a juror when the trial judge believes that the juror would be fair and impartial, . . . we find no abuse of discretion in the refusal by the trial court to remove Juror Number Six." *Koehler*, 737 A.2d at 238-39 (citations omitted); *see also Briggs*, 12 A.3d at 333-34 (finding no basis in the prospective jurors' *voir dire* answers to reverse the trial court's discretionary ruling declining to excuse for cause three jurors because of attenuated relationships with the victims or their families).[18]

---

[18]    *See also Linsenmeyer v. Straits*, 166 A.2d 18, 23 (Pa. 1960) (applying an abuse of discretion standard to affirm the trial court's rejection of for-cause challenges made because prospective jurors knew plaintiff's attorney and had prior legal relationships with plaintiff's law firm); *Commonwealth ex rel. Fletcher v. Cavell*, 149 A.2d 434 (Pa. 1959) (finding no abuse of discretion in declining to excuse for cause a juror who was son-in-law of a detective who investigated the crime or a juror who was a second cousin once removed of the victim); *Commonwealth v. Peronace*, 195 A. 57, 59 (Pa. 1937) (finding no abuse of discretion in declining to dismiss for cause relatives of the county detective and political allies of the district attorney who indicated that they had no opinion on the case); *Commonwealth v. Blasioli*, 685 A.2d 151, 158 (Pa. Super. 1996) (holding that where the prosecutor's wife was a juror's family doctor, and the juror worked at the same hospital as the prosecutor's wife, the relationship did not require a presumption of prejudice, and deferring to the trial court's acceptance of the juror's assertions during jury selection); *Commonwealth v. Lee*, 585 A.2d 1084 (Pa. Super. (continued...)

Few cases in our Commonwealth have examined employment relationships between jurors (or their family members) and corporate parties. However, Pennsylvania law clearly holds that, where there is a direct employment relationship between a juror and a party or participant, the courts must presume prejudice and the juror must be stricken for cause. *Hufnagle*, 76 A. at 206; *McHugh*, 776 A.2d at 270 (; *Schwarzbach*, 381 A.2d at 1297 (presuming prejudice and reversing the trial court's refusal to excuse a juror whose wife had an uncertain history of employment with the law firm representing the plaintiff).

*McHugh* illustrates the presumption of prejudice that results from a direct employment relationship. There, plaintiff's counsel requested the trial court to strike, for cause, all potential jurors employed by the corporate defendant, Proctor & Gamble. *McHugh*, 776 A.2d at 268. The trial court denied the request. On appeal, the plaintiff challenged the trial court's denial of the for-cause challenges. The Superior Court agreed with the plaintiff that the trial court committed an error of law. According to the court, "the employer/employee relationship evokes a presumption of prejudice so significant as to warrant disqualification of employees of a party." *Id.* at 270.[19] This

---

(...continued)
1991) (reviewing for an abuse of discretion the trial court's decision not to strike a retired police officer for cause); *Commonwealth v. Bright*, 420 A.2d 714 (Pa. Super. 1980) (finding no abuse of discretion in declining to excuse a juror who lived in the same neighborhood as the prosecuting attorney and had known him since he was a child); *Commonwealth v. Yohn*, 414 A.2d 383 (Pa. Super. 1979) (upholding the trial court's exercise of discretion where the trial court refused to disqualify a juror who had been employed by the victim three or four years before the crime, or a juror who had gone on a fishing trip six to eight years before the trial with a police officer who was the superior of the prosecuting officer); *Commonwealth v. Colon*, 299 A.2d 326, 328 (Pa. Super. 1972) (holding that law enforcement officers should only be removed for cause when, in the trial court's discretion, their answers and demeanor on *voir dire* demonstrate a likelihood for prejudice).

[19] As the *McHugh* court observed, precedent from other states supported its holding. *McHugh*, 776 A.2d at 271; *see also Merritt v. Evansville-Vanderburgh Sch.* (continued...)

conclusion flowed from the notion that a juror whose livelihood derives from a party cannot be expected to render an impartial verdict in a case involving that party. *Id.* at 272. We agree. A direct employment relationship, *i.e.*, the relationship between an employer and employee, is a close relationship that requires a presumption of prejudice.

*Cordes* presented a number of more attenuated employment relationships. In *Cordes*, the Superior Court *en banc* examined, *inter alia*, the prospect of partiality or bias arising from an indirect situational relationship between a juror (Richard Majors) whose employer, Heritage Valley Health Systems, owned a named corporate defendant, Tri-State Medical Group, which was also the defendant physician's employer. In addition to this indirect employment relationship, Majors revealed during *voir dire* his belief that his employer had a financial interest in the outcome of the litigation through its subsidiary, the corporate defendant, and his belief that he and the defendant physician shared a common employer. The trial court declined to excuse Majors for cause. Seven members of a nine-judge panel voted in favor of reversal, but neither of the two lead opinions succeeded in garnering the votes of a majority of the judges.

---

(...continued)
*Corp.*, 735 N.E.2d 269 (Ind. Ct. App. 2000) (holding that the trial court should have granted plaintiff's challenges for cause to two employees of defendant corporation); *Hutchins v. DCH Reg'l Med. Ctr.*, 770 So.2d 49 (Ala. 2000) (holding that the trial court had no discretion to deny plaintiff's challenges for cause directed toward two prospective jurors who were employees of the defendant); *People v. Rhodus*, 870 P.2d 470 (Colo. 1994) (citing a statute which provides that a trial court must sustain a challenge for cause on the ground that a juror is an employee of a party); *Metropolitan Dade County v. Frank J. Rooney, Inc.*, 627 So.2d 1248 (Fla. Dist. Ct. App. 1993) (holding that the trial court erred by failing to disqualify an employee of defendant county); *Carle v. McChord Credit Union*, 827 P.2d 1070 (Wash. Ct. App. 1992) (holding that the trial court did not abuse its discretion by excusing a prospective juror for cause on the challenge by the employee plaintiff on the basis of implied bias).

This author opined, *inter alia*, that indirect relationships between a juror and a party "may furnish a basis for *per se* exclusion." *Cordes*, 87 A.3d at 838 (OISR, Wecht, J.). Although Majors was not employed by a named defendant, this author opined that his bias was implicit because "he was employed by an entity that he believed loomed over himself and the other defendants." *Id.* at 845. This author recognized that Majors' bias was made explicit by his recognition that his employer had "an undisputed financial interest in the outcome of the litigation." *Id.* The employment relationship, viewed "in tandem" with Majors' recognition regarding his employer's financial interest, *id.* at 845 n.12, "created a sufficient risk of partiality to establish prejudice *per se* arising from his jury service." *Id.* at 845.

Also writing in support of reversal, now-Justice, then-Judge Donohue agreed that an indirect relationship could require disqualification, but did not believe that the court could presume prejudice from Majors' employer's ownership interest in a named corporate defendant: "The purported employment relationship between Juror Majors and Dr. Ray, standing alone, is too attenuated to warrant the grant of a challenge for cause in this case." *Id.* at 869 (OISR, Donohue, J.). According to Justice Donohue, Majors should have been disqualified due to his "perception of the financial impact the verdict could have on his employer." *Id.* at 869-70 (OISR, Donohue, J.).

Hence, the two OISRs in *Cordes* differed as to whether Majors' connection to the case through his employer was sufficiently close as to warrant a presumption of prejudice. However, the two opinions agreed that the *voir dire* of Majors revealed actual bias; specifically, Majors' belief that his employer had a pecuniary interest in the outcome of the case.

We agree with the convergence of the OISRs in *Cordes*. An indirect employment relationship with an employer that has an ownership interest in a party defendant,

standing alone, does not warrant a presumption of prejudice. However, a juror may reveal a likelihood of prejudice resulting from such an indirect employment relationship through his or her conduct or answers to questions. Because the law endeavors to hold the jury system free from any appearance of partiality, it is incumbent upon trial courts to explore specific, indirect employment relationships between jurors (and their close family members) and parties, and to be vigilant in guarding against the appearance of partiality that can arise in the context of such relationships.[20] An indirect employment relationship will require removing a potential juror for cause if the juror believes that the outcome of the case could have a financial impact upon his or her employer. When it is apparent both that there is a common employer between a juror or a juror's close family member and a party defendant, and that the juror believes that the employer would be affected by the outcome of the case, the trial court must remove the juror for cause.[21]

---

[20] In this regard, we caution that when a prospective juror is challenged because of a familial, financial, or situational relationship to case participants, and the trial court explores the nature of this relationship, the trial court should not accept automatically the juror's assertions of impartiality. A juror may not be aware of, or recognize, his or her own prejudice. Trial courts are best positioned to recognize a juror's potential sources of prejudice and partiality as they exist at the time of *voir dire* and as they may arise during the litigation, and to delve into the reasons for the juror's answers. Notably, despite Majors' views that he shared an employer with a party and believed his employer would be economically harmed by an adverse verdict, he nonetheless professed to the court that he could rule impartially. *Cordes*, 87 A.3d at 844 (OISR, Wecht, J.).

[21] Neither the parties nor the lower courts dispute that a juror's disqualification for cause could result from an immediate family member's close familial, financial, or situational relationship to a case party or participant, or that Ackley and Nagle present the type of relationship with their wife and son, respectively, that could warrant a presumption of prejudice if the wife's or son's relationship to the case was sufficiently close. Rather, the parties and lower courts focused upon whether the juror or their family member's employment relationship was sufficiently close to the parties to require a presumption of prejudice. We recognize the two OISRs in *Cordes* differ on the degree to which a juror's family member's connection to the case will impact the analysis. *See Cordes*, 87 A.3d at 843 (Wecht, J., OISR) ("But the bonds between parent and child, and husband and wife, are too strong, and the attendant interests too inextricably (continued...)

This case presents several indirect employment relationships that are more attenuated than the indirect employment relationship in *Cordes*. Majors' connection to the defendant in *Cordes* was through his employer, which owned one defendant and employed another. The four jurors at issue in today's case were two or three degrees removed from the scenario presented by Majors in *Cordes*, as they or their close family members were employed by companies owned by the same parent company that owned Dr. Toms' employer. Unlike in *Cordes*, none of the corporate subsidiaries are parties. Neither Geisinger Health System nor Geisinger Clinic were trial defendants. Dr. Toms was the only defendant. None of the jurors knew Dr. Toms.Further, as the trial court developed during *voir dire*, none of the jurors worked directly for Dr. Toms' employer, Geisinger Clinic, or at the facility where Mrs. Shinal's surgery was performed, Geisinger Medical Center. Nor was there any indication that the non-party Geisinger employers had a financial stake in the outcome of the litigation. In particular, Woll was employed as "an admin secretary for the sleep labs," R.R. 246a, which was in turn owned by Geisinger Health System, which also owned Geisinger Clinic, which employed Dr. Toms. Ackley was connected through his wife, who worked for "Dr. Ryan in pediatrics," R.R. 250a-51a, and was therefore employed by a Geisinger entity owned by Geisinger Health System, which, again, also owned Geisinger Clinic, which

---

(...continued)
intertwined, to allow us to draw the distinction between direct and vicarious clinical relationships that we would require in order to affirm the trial court's decision."); id. at 867-68 (Donohue, J., OISR) (explaining that the presumption of prejudice is warranted under principles recognizing the special bond between spouses, but is not based upon "the simple fact that the juror's parents were patients of the defendant doctor in this medical malpractice case. . .."). However, because we find that Ackley's wife and Nagle's son did not have a disqualifying employment relationship to the parties, counsel, victims, or witnesses, *see Bridges*, 757 A.2d at 873, we do not resolve here whether a juror's filial or parental connection to the case, standing alone, would disqualify the juror.

employed Dr. Toms. Schiffino was employed as a customer service representative for Geisinger Health Plan, R.R. 271a-72a, 353a, which was owned by Geisinger Health System, which, again, also owned Geisinger Clinic, which employed Dr. Toms. Finally, alternate juror Nagle was retired from employment as a physician assistant in plastic surgery and gastrointestinal medicine, for an entity owned by Geisinger Health System, which also owned Geisinger Clinic, which employed Dr. Toms. Nagle additionally was connected through his son, who worked as a security officer at "Geisinger." R.R. 309a-11a. It is not clear whether Nagle's son worked directly for Geisinger Heath System or a Geisinger entity owned by Geisinger Health System, which of course also owned Geisinger Clinic, which employed Dr. Toms.

Facially, the indirect familial, financial, or situational relationships presented by these four jurors are not akin to the close relationships as to which we have presumed prejudice in the past. The respective relationships between Dr. Toms and Woll, Schiffino, or Nagle, through their current or former non-party employer's parent company, or between Ackley or Nagle through, respectively, their wife's or son's non-party employer's parent company, were indirect, and not sufficiently close so as to require a presumption of prejudice as a matter of law.

Because this case presents an indirect employment relationship, it was incumbent upon the trial court to engage the jurors in questioning to reveal whether they believed that their or their family member's current or former employer would be financially harmed by an adverse verdict or whether the relationship would affect the jurors' respective abilities to be impartial. In assessing the trial court's acceptance of the juror's answers, we apply a deferential standard of review and will reverse the trial court upon a palpable abuse of discretion. *Koehler*, 737 A.2d at 238.

Relying upon Justice Donohue's OISR in *Cordes*, the trial court asked the jurors whether they believed that they, or their family members, and Dr. Toms were employed by the same company, and whether they or their family members' employer would be financially affected by the litigation. None of the jurors believed that a verdict against Dr. Toms would financially impact their employer or a family member's employer, and each stated that he or she could act impartially. In particular, the trial court asked Woll if she perceived that she and Dr. Toms were employed by the same company. Woll responded that she and Dr. Toms "don't even work in the same building." R.R. 246a. Woll further responded that she did not believe that a verdict against Dr. Toms would have a negative financial impact on her employer, and she averred that she could be fair and impartial. *Id.* at 247a.[22]

---

[22] On this point, Woll answered as follows:

Q.   Do you perceive that you and Dr. Toms are employed by the same company?

A.   I don't even work in the same building as he does.

Q.   What is the answer?

A.   I don't work in the same building as he does.

Q.   I want to know what your perception is?

A.   It's a big umbrella. Yes, we do work for the same company but —

Q.   Do you believe that if there happened to be a verdict against Dr. Toms in this case, that it would negatively financially affect your employer?

A.   Probably not.

Q.   Why?

A.   There is malpractice insurance and I can't see that it would affect Geisinger financially, nothing ever does.

Q.   I'm curious why do you say nothing ever financially impacts Geisinger. Why do you say that?

(continued...)

Ackley believed that his wife and Dr. Toms were employed by the same company. R.R. 251a ("They do work for the same company."). Given this belief, the trial court asked whether Ackley believed that a negative verdict against Dr. Toms would have an adverse effect upon his wife's employer. *Id.* Ackley initially indicated that he did not know how to answer. *Id.* Upon further inquiry, Ackley indicated that there would be no negative financial impact upon his wife's employer, and that he was able to be fair and impartial. *Id.* 251-52a.[23]

---

(...continued)

    A.    If they had to rename Danville it would be Geisingerville, probably 60% to 80% of the people who live here are employed at Geisinger in one way or another.

R.R. 246a-47a.

[23]    Ackley was examined as follows:

Q.    My question is, do you perceive that your wife and Dr. Toms are employed by different companies or the same?

A.    I'm sorry. They do work for the same company.

Q.    Given your perception that they work for the same company, do you perceive that a negative verdict against Dr. Toms in this case, if that is what a Jury chose to do, could negatively financially impact your wife's employer?

A.    I really don't know how to answer that question.

Q.    Let me see if I can come up with a different way to ask it. If there is a negative verdict against Dr. Toms, do you believe that it would cost Dr. Toms' employer money?

A.    Well, yeah.

Q.    Do you regard Dr. Toms as being employed by the same company as your wife?

A.    Yes.

Q.    So do you think that there would be a negative financial impact on your wife's employer if there were a negative verdict against Dr. Toms in this case?

A.    I would say no.

Q.    No affect?

(continued...)

Although Schiffino initially was confused by the trial court's questions, she did not believe that she and Dr. Toms were employed by the same employer, R.R. 272a, and did not believe that a negative verdict against Dr. Toms would have a negative financial impact upon her employer. *Id.*[24]

---

(...continued)

> Q.   No impact on your wife's employer?
>
> A.   No.
>
> Q.   No impact on your wife's employer?
>
> A.   No.
>
> Q.   In this case, given your wife's employment at Geisinger, and any other connection you have with Geisinger, being you are a patient there or have been a patient there or anything else, would you be unable in this case to be a fair and impartial juror?
>
> A.   No.

R.R. 251a-52a.

[24]   The trial court questioned Schiffino as follows:

> Q.   Do you perceive yourself and Dr. Toms to be employed by the same company?
>
> A.   Well, it's Geisinger Health System. It's not a separate company but it is part of the same umbrella, I guess.
>
> Q.   Would you perceive that if a Jury chose to enter a verdict against Dr. Toms, would you perceive that to carry with it a negative financial impact upon your employer?
>
> A.   Again, it would be a negative impact against Geisinger Health System, Geisinger Medical Center.
>
> Q.   Do you regard Geisinger Health System as your employer?
>
> A.   Okay, I wasn't understanding. No, I regard Geisinger Health Plan as my employer.
>
> Q.   So let me re-ask the question. If there were a negative verdict against Dr. Toms would you regard that as having a negative financial impact upon your employer?
>
> A.   No.
>
> Q.   Would you be unable to sit as fair and impartial juror in this case given your affiliations?
>
> A.   I would be able to be fair.

(continued...)

After the trial court established that Nagle did not know Dr. Toms from his employment as a physician assistant, Nagle indicated that, although he perceived his son to be working for the same company as Dr. Toms, he did not believe a verdict against Dr. Toms would have a negative financial effect upon his son's employer. *Id.* at 309a-12a.[25]

The trial court accepted the jurors' answers, finding that none of the four challenged jurors believed that a verdict against Dr. Toms would negatively affect their,

---

(…continued)
R.R. 272a-73a.

[25] Juror Nagle was questioned as follows:

Q.  Would you perceive a negative financial verdict against Dr. Toms in this case if a Jury chose to do that as being or as carrying a negative financial impact on your son's employer?

A.  I don't believe so.

Q.  Why not?

A.  Well, I don't have any particular thoughts really one way or the other. I don't think that they would have a particular negative impact on Geisinger, other than just the knowledge in the community through the newspaper and new media and so forth.

\* \* \*

Q.  Your son works at Geisinger and you probably have other connections, okay? Do you believe that you would be unable to be fair and impartial in this particular case to sit as a juror?

A.  (No response.)

Q.  Because it is against a Geisinger Doctor?

A.  No, I don't believe that I would. I believe I can be fair.

R.R. 310a-12a.

Because we dispose of the Shinals' claim of trial court error as it pertains to Nagle on the merits, we do not reach Dr. Toms' argument that any trial court error in declining to dismiss Nagle for cause was harmless because Nagle, as an alternate juror, was never called upon to deliberate.

or their close family member's, employer. Tr. Ct. Op. at 9. The trial court further accepted each juror's testimony that he or she could remain fair and impartial. *Id.* Given the jurors' answers during *voir dire*, the trial court did not abuse its discretion in declining to strike those jurors for cause. *See Fletcher*, 149 A.2d at 437 (finding no abuse of discretion where "the trial judge was most circumspect in ascertaining whether . . . [challenged jurors] were capable of rendering fairly a verdict on the evidence adduced").

Finally, we decline to accept the Shinals' broad assertion that a claim against a "Geisinger" employee for actions committed during his employment necessarily has a negative impact upon all entities bearing the Geisinger name. *See* Appellant's Brief at 26. The cause of action against Dr. Toms alleged failure to obtain informed consent. The claim did not encompass any misconduct by any Geisinger entity. As the trial court recognized, "a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable." *Valles*, 805 A.2d at 1239.

B.  Jury Instruction: Informed Consent

The next issue is whether the trial court misapplied the common law and the MCARE Act when it instructed the jury that it could consider information provided to Mrs. Shinal by Dr. Toms' "qualified staff" in deciding whether Dr. Toms obtained Mrs. Shinal's informed consent to aggressive brain surgery.[26]

The trial court initially instructed the jury that, in assessing whether Dr. Toms obtained Mrs. Shinal's informed consent, it could consider relevant information communicated by "any qualified person acting as an assistant" to Dr. Toms.  R.R. 673a. In response to a question from the jury seeking clarification,[27] the trial court elaborated as follows:

> Now, I phrased it that way because it's within your province to determine a recollection of the evidence you heard, who said what, who those people were that said these things and whether or not they were assistants to Dr.

---

[26]  Dr. Toms asserts that the Shinals have waived their objection to the jury charge, citing generally Pa.R.C.P. 227.1 (addressing the availability of post-trial relief) and Pa.R.A.P. 302(b) (requiring exceptions to jury charges to be specific, not general).  We reject this argument.  In response to Dr. Toms' proposed jury charge instructing the jury to consider information provided by Dr. Toms' qualified staff, the Shinals filed a brief in opposition arguing, *inter alia*, that only Dr. Toms could provide such information.  The trial court overruled the Shinals' objection.  The Shinals again raised the issue in a timely post-trial motion.  By lodging a specific objection to the proposed charge, and challenging the charge in their post-trial motion, the Shinals preserved their objection. Moreover, the trial court acknowledged at argument on post-trial motions that the Shinals "were objecting left and right" to the jury charge.  See R.R. 775a.  The trial court was thus aware of the Shinals' challenge to the jury charge, rejected it on the merits, and considered the issue preserved following trial. *See Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 n.5 (Pa. 1981) ("Although no specific objection was made at trial to the charge given, appellants' exception to the trial court's refusal to charge as requested . . . was sufficient to put that charge before us for appellate review.").

[27]  Specifically, the jury inquired: "Under legal guidelines, can the [physician assistant] be part of informing the patient of a surgical procedure?  Meaning, information given to a patient from a [physician assistant] is part of the information required for a patient to give informed consent." R.R. 705a.

Toms, you know, working under him. And I said any qualified person. There are different types of qualifications of medical personnel.

And it is up to you to determine whoever you remember provided information to [Mrs. Shinal], it's up to you to determine whether they were a qualified person working as an assistant to Dr. Toms. . . .

R.R. 693a-94a.

The Shinals assert that the jury charge misstates our common law as expounded in *Valles*, 805 A.2d at 1232, conflicts with the MCARE Act, 40 P.S. § 1303.504, and is unsupported by the trial evidence. Dr. Toms responds that the jury charge was consistent with precedent and with Section 504 of the MCARE Act, 40 P.S. § 1303.504. In this respect, Dr. Toms argues that, while it is the physician's duty to obtain the patient's informed consent, the physician is not required to supply all of the information personally. Rather, according to Dr. Toms, it is the information conveyed, rather than the person conveying it, that determines informed consent.

In examining jury instructions, "our scope of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." *Quinby v. Plumsteadville Family Practice, Inc.,* 907 A.2d 1061, 1069 (Pa. 2006). An erroneous charge provides grounds for a new trial if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse a material issue. *Id.* at 1070. Our examination of a trial court's charge to the jury includes a review of the charge in its entirety. *Id.* "Because this is a question of law, this Court's review is plenary." *Id.* To the extent that our interpretation turns upon language in the MCARE Act, statutory interpretation also is a question of law for which our standard of review is *de novo* and our scope of review is plenary. *Allstate Life Ins. Co. v. Commonwealth,* 52 A.3d 1077, 1080 (Pa. 2012). Under the rules of statutory construction, we cannot ignore the plain meaning of a statute when the words of that statute are unambiguous, 1 Pa.C.S. § 1921(b), nor can we disregard the plain meaning

of an unambiguous statute in order to pursue its spirit. *Id.* Although it is undisputed that the duty to obtain informed consent is imposed solely upon Dr. Toms, we must resolve whether Dr. Toms can satisfy this duty wholly or in part through his staff's communications with Mrs. Shinal.

The doctrine of informed consent protects a patient's bodily integrity and autonomy in determining what medical treatment to allow. The doctrine recognizes that a patient has the right to be informed by his or her physician of the risks and benefits attending a proposed course of treatment in order to enable the patient to make an informed decision about the treatment. To ensure informed consent, the physician has a duty to inform the patient about the risks, benefits, likelihood of success, and alternatives. *Valles*, 805 A.2d at 1237 (holding that "doctors must provide patients with" sufficient information to "give the patient 'a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results'") (quoting *Duttry v. Patterson*, 771 A.2d 1255, 1258 (Pa. 2001) (further citations omitted)).

The doctrine of informed consent developed through the common law under the theory that a surgery conducted without consent was a battery, *see Smith v. Yohe*, 194 A.2d 167, 174 (Pa. 1963), and that, to be effective, a patient's consent must be informed, *i.e.*, based upon adequate information, *Gray v. Grunnagle*, 223 A.2d 663 (Pa. 1966). Without the patient's informed consent, the physician is liable for the procedure, regardless of whether the physician was negligent.

Based upon the contractual nature of the physician-patient relationship, we have held that "for there to be valid consent it must be clear that both parties understand the nature of the undertaking and what the possible as well as the expected results might be." *Id.* at 674. Without this meeting of the minds, a patient's understanding is

incomplete, and the patient's right to medical self-determination is violated. It is within this physician -patient relationship that the doctrine of informed consent comes to the fore and obligates the physician to inform the patient of the risks, benefits, alternatives, and likelihood of success of the treatment.

In *Bulman v. Myers*, 467 A.2d 1353 (Pa. Super. 1983), the Superior Court rejected the appellant's argument that the trial court erred in declining to charge the jury that "a patient cannot formulate a valid, informed consent to a surgical procedure when disclosures of the risks of surgery are made by a nurse assistant and not by the operating surgeon." *Id.* at 1354. The Superior Court reasoned that "the primary interest of Pennsylvania jurisprudence in regard to informed consent is that of having the patient informed of all the material facts from which he can make an intelligent choice as to his course of treatment." Id. at 1355 (quoting *Sauro v. Shea*, 390 A.2d 259, 262-63 (Pa. Super. 1978)). Similarly, in *Foflygen v. Allegheny General Hosp.*, 723 A.2d 705 (Pa. Super. 1999), the Superior Court held that "the validity of a surgical patient's informed consent depends upon the pretreatment information relayed to the patient, regardless of whether the disclosures are made by the treating physician or another qualified person such as a nurse or other assistant." *Id.* at 707.

This Court has held that the duty to obtain informed consent belongs solely to the physician and that it is non-delegable. *Valles*, 805 A.2d at 1239. Indeed, we have defined the physician's duty to obtain informed consent in terms of requiring physicians to provide patients with the requisite information, *id.* at 1237, and as flowing "from the discussions each patient has with his physician." *Id.* at 1239. In *Valles*, we held that the duty to obtain informed consent rests solely upon the healthcare provider performing a medical procedure, and not upon a hospital. Therefore, a hospital has no duty to

obtain a patient's informed consent nor to ensure that physicians operating at the hospital secure the patient's informed consent.

Pursuant to *Valles*, the duty to obtain a patient's informed consent is a non-delegable duty owed by the physician conducting the surgery or treatment. Because obtaining informed consent results directly from the duty of disclosure, which lies solely with the physician, a hospital cannot be liable for a physician's failure to obtain informed consent. As the Superior Court has explained,

> [i]t is the surgeon and not the hospital who has the education, training and experience necessary to advise each patient of risks associated with the proposed surgery. Likewise, by virtue of his relationship with the patient, the physician is in the best position to know the patient's medical history and to evaluate and explain the risks of a particular operation in light of the particular medical history.

*Kelly v. Methodist Hosp.*, 664 A.2d 148, 151 (Pa. Super. 1995).

For the same reasons, we hold that a physician cannot rely upon a subordinate to disclose the information required to obtain informed consent. Without direct dialogue and a two-way exchange between the physician and patient, the physician cannot be confident that the patient comprehends the risks, benefits, likelihood of success, and alternatives. *See Valles*, 805 A.2d at 1239 (providing that informed consent flows from discussions between the physician and patient); *Gray*, 223 A.2d at 674 (requiring both parties to understand the nature of the procedure and the expected results). Informed consent is a product of the physician-patient relationship. The patient is in the vulnerable position of entrusting his or her care and well-being to the physician based upon the physician's education, training, and expertise. It is incumbent upon the physician to cultivate a relationship with the patient and to familiarize himself or herself with the patient's understanding and expectations. Were the law to permit physicians to delegate the provision of critical information to staff, it would undermine patient autonomy and bodily integrity by depriving the patient of the opportunity to engage in a

dialogue with his or her chosen health care provider. A regime that would countenance delegation of the informed consent process would undermine the primacy of the physician-patient relationship. Only by personally satisfying the duty of disclosure may the physician ensure that consent truly is informed.

Our account of the common law is consistent with the MCARE Act's codification of informed consent:

> (a) Duty of physicians.—Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
>> (1) Performing surgery, including the related administration of anesthesia.
>>
>> * * *
>
> (b) Description of procedure.—Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted medical standards of medical practice would provide.

40 Pa.C.S. § 1303.504.

Under the plain language of this section, the duty to obtain a patient's informed consent for the several enumerated procedures, including surgery, belongs to the physician. Section 504 does not merely require that the patient's consent be informed; it specifically imposes the duty upon physicians to provide to the patient the requisite information and to obtain informed consent. Nothing in the plain language of the Act suggests that conversations between the patient and others can control the informed consent analysis or can satisfy the physician's legal burden. Indeed, Subsection 504(b) permits a physician to defend against an alleged failure to obtain informed consent by presenting evidence of the information that a physician acting in accord with established medical standards would provide. Again, the focus is upon the physician's provision of

information directly to the patient, not merely upon the patient's receipt of such information from various sources.[28]

Indeed, Dr. Toms' understanding of his obligation to provide information to Mrs. Shinal and to obtain her informed consent is consistent with ours. Dr. Toms testified that he views informed consent as "a real compact between the surgeon and the patient that he or she trusts me with their life[,] and I need to know they understand that this is serious, bad things could happen." R.R. 530a. To this end, Dr. Toms explained that he does not delegate the obligation to obtain a patient's informed consent. *Id.* at 531a ("Truly, we're not allowed to have a [physician assistant] or a resident physician [review the procedure with the patient], I have to do it, I have to hear it, I have to know it.").

Thus, we hold that a physician may not delegate to others his or her obligation to provide sufficient information in order to obtain a patient's informed consent. Informed consent requires direct communication between physician and patient, and contemplates a back-and-forth, face-to-face exchange, which might include questions that the patient feels the physician must answer personally before the patient feels informed and becomes willing to consent. The duty to obtain the patient's informed consent belongs solely to the physician. *Bulman* and *Foflygen*, upon which the lower

---

[28] Requiring direct communications between the physician and the patient to establish informed consent also serves the general objective of the MCARE Act to reduce the costs of malpractice insurance. "The quality of physician-patient communications is associated with general patient dissatisfaction, which in turn is correlated to the litigation risk of the physician." Daniel A. Durst, *Cutting Through Pennsylvania's Medical Informed Consent Statute: A Reasonable Interpretation Abolishing the Surgical Requirement*, 104 DICK. L. REV. 197, 216 (1999) (citing LaRae I. Huycke et al., *Characteristics of Potential Plaintiffs in Malpractice Litigation*, 12 Annals of Internal Med. 792, 796 (1994)). Thus, increased communication between the physician and patient relative to informed consent, as opposed to the physician's delegation of communication to an agent or employee, enhances patient satisfaction, reduces the risk of litigation, and is consonant with the legislative goal of reducing malpractice costs.

courts and Dr. Toms relied, are Superior Court cases which pre-date *Valles* and the MCARE Act. To the extent that those decisions permit a physician to fulfill through an intermediary the duty to provide sufficient information to obtain a patient's informed consent, we overrule them.

\* \* \*

We reverse the Superior Court's order affirming the trial court's denial of the Shinals' motion for post-trial relief, and we remand for a new trial consistent with this opinion.

Jurisdiction relinquished.

Justices Donohue and Dougherty join the opinion.

Justice Todd joins the opinion except with respect to Part II(A)(2) and files a concurring and dissenting opinion.

Justice Mundy joins Parts I and II(A) of the opinion.

Justice Baer files a dissenting opinion in which Chief Justice Saylor joins and Justice Mundy joins Part I of the dissent.