**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CLARE M. RHOADS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF L.A.C., A MINOR, | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : | |
| v. | : : | |
| SANDRA E. HOOPS, CNM; STEPHEN L. SEGRAVE-DALY, M.D.; EMMA G. CARGADO-LEYNES, D.O.; AND WOMEN FIRST OBSTETRICS & GYNECOLOGY, P.C. | : : : : : | No. 245 MDA 2018 |

Appeal from the Judgment Entered February 27, 2018
in the Court of Common Pleas of Dauphin County
Civil Division at No(s):  2014-CV-3096-MM

BEFORE:  GANTMAN, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED JANUARY 23, 2019**

Clare M. Rhoads ("Rhoads"), individually and as parent and natural guardian of L.A.C., a minor, appeals from the Judgment entered on February 27, 2018,[1] following a jury verdict in favor of Stephen L. Segrave-Daly, M.D.

---

[1] Rhoads purports to appeal from the January 17, 2018 Order denying her post-trial Motion.  "However, an appeal properly lies from the entry of judgment, not from the denial of post-trial motions."  **Hall v. Jackson**, 788 A.2d 390, 395 n.1 (Pa. Super. 2001).  As final judgment had not been entered on the trial court docket, this Court entered an Order on February 26, 2018, directing Rhoads to praecipe for entry of judgment.  Rhoads timely complied, and supplied this Court with a copy of the trial court docket reflecting the entry of Judgment on February 27, 2018.  This Court thereafter entered an Order discharging the February 26, 2018 Order, referring a determination as to the propriety of the appeal to the merits panel.  Because Rhoads timely complied with this Court's Order, we will treat Rhoads's Notice of Appeal as timely filed following the entry of Judgment.  **See** Pa.R.A.P. 905(a)(5).

("Dr. Segrave-Daly"), Emma G. Cargado-Leynes, D.O. ("Dr. Cargado-Leynes"), and Women First Obstetrics & Gynecology, P.C. ("Women First") (collectively, "Defendants"), in this medical malpractice action. We affirm.

On September 27, 2012, Rhoads presented to Harrisburg Hospital for induction of labor. Rhoads was admitted under the care of Sandra E. Hoops, CNM ("Hoops"), an employee of Woodward & Associates, P.C. ("Woodward"), who was on call at that time.[2] L.A.C.'s cardio-respiratory condition was monitored using electronic fetal monitoring ("EFM") throughout Rhoads's labor.

Hoops performed a vaginal exam at approximately 7:45 a.m. on September 28, 2012, after which she artificially ruptured Rhoads's membranes and ordered Pitocin to augment labor.

Hoops performed another vaginal exam at approximately 2:13 p.m., and her notes accompanying the progress record indicated a compound hand presentation at that time.

At approximately 3:55 p.m., when Rhoads was fully dilated, Hoops asked Dr. Segrave-Daly, the attending obstetrician, to evaluate Rhoads. Dr. Segrave-Daly's notes accompanying the progress report also indicated that the fetal hand was located next to the fetal vertex, but that he did not believe it would impair descent of the vertex.

_____

[2] Rhoads previously received all of her pre-natal care through Women First.

Hoops's shift ended at approximately 5:00 p.m., and Dr. Cargado-Leynes took over Rhoads's care. At approximately 6:45 p.m., after three hours of pushing by Rhoads, Dr. Cargado-Leynes was asked to evaluate her labor progress. Dr. Cargado-Leynes's notes accompanying the progress report indicate that attempts were made to sweep the hand out of the way of the fetal vertex. Dr. Cargado-Leynes ultimately ordered a Cesarean section operation ("C-section") for lack of progress. The surgery began at 8:08 p.m., and L.A.C. was delivered by primary low C-section at 8:14 p.m.

At birth, L.A.C. had swelling and bruising on his right arm, and exhibited a decreased range of motion in his right arm, as compared to his left arm. On September 30, 2012, The neonatal intensive care unit contacted Theodore Foley, M.D. ("Dr. Foley"), a board-certified plastic surgeon, for a consultation. Dr. Foley examined L.A.C. at approximately 8:30 a.m. the same day, at which time Dr. Foley observed sensory deficits in L.A.C.'s right arm and hand (particularly, a decreased pain response), as compared to his left arm. Dr. Foley determined that L.A.C. had compartment syndrome in his right arm, and that he would need a fasciotomy.[3] L.A.C. was taken to the operating room at approximately 11:30 a.m., and Dr. Foley successfully performed the fasciotomy.

_____

[3] Dr. Foley testified during his deposition that a fasciotomy is a procedure whereby the fascia is cut to relieve pressure, and allow the muscles to expand outward. **See** N.T. (Foley Deposition), 10/26/16, at 10, 13; **see also** N.T., 9/15/17, at 907-08 (wherein Dr. Foley's video deposition was shown to the jury, and the transcripts were admitted into evidence at trial).

On April 4, 2014, Rhoads filed a Complaint, asserting a medical malpractice theory of negligence against Hoops, and a theory of vicarious liability against Woodward. Rhoads claimed that L.A.C.'s compartment syndrome was the result of Hoops's negligence, including, *inter alia*, her failure to deliver L.A.C. by C-section sooner, based on fetal heart rate changes indicated by EFM. Rhoads argued that as a result of Hoops's negligence, she incurred, and would continue to incur, medical expenses to improve L.A.C.'s condition, and that she suffered severe mental anguish, emotional distress, and physical pain and suffering. Rhoads also claimed that L.A.C. would require future medical treatment, suffer a loss of earning power as a result of physical disability, and experience pain and suffering, embarrassment and humiliation, disfigurement, and inconvenience in carrying out his daily activities. Rhoads sought judgment in excess of $50,000, exclusive of interest and costs.

Rhoads also served Hoops and Woodward with Interrogatories and Requests for Production of Documents.

On September 2, 2014, Rhoads filed a second Complaint, asserting a medical malpractice theory of negligence against Hoops, Dr. Segrave-Daly, Dr. Cargado-Leynes, and Katharyn L. Kraemer, CNM ("Kraemer"), and a theory of vicarious liability against Women First and Woodward. Rhoads's medical malpractice claims against the individual defendants were identical to those asserted against Hoops in the first Complaint.[4]

---

[4] On January 5, 2015, the parties stipulated to the consolidation of the two actions, and the amendment of the caption.

On October 14, 2014, Rhoads filed a Motion to Compel Discovery Answers, asserting that neither Hoops nor Woodward had filed an answer or new matter, or responded to her discovery requests. The trial court granted Rhoads's Motion to Compel on November 24, 2014.

Dr. Segrave-Daly, Woodward, and Hoops each filed an Answer and New Matter. Dr. Cargado-Leynes, Kraemer,[5] and Women First jointly filed an Answer and New Matter.

On May 18, 2015, Rhoads sent Requests for Admissions to each of the remaining individual defendants.[6]

By a stipulation approved by the trial court and entered on the docket on April 29, 2016, Rhoads agreed to discontinue all claims against Woodward and dismiss Woodward from the action.

Following a status conference, the trial court entered a case management Order on July 26, 2016, directing, *inter alia*, Rhoads to produce expert reports and curriculum vitae by October 31, 2016, and Defendants to produce the same by December 15, 2016.

---

[5] On January 23, 2015, the parties stipulated that Kraemer did not provide any care or treatment to Rhoads during her labor and delivery, and did not provide any care before approximately 8:10 a.m. on September 30, 2012. The parties therefore agreed to voluntarily discontinue all claims against Kraemer, as well as any claims against Women First arising out of Kraemer's alleged actions. On February 18, 2015, the trial court entered an Order discontinuing the actions against Kraemer and related claims against Women First, and amending the caption accordingly.

[6] Rhoads also filed a third Complaint on September 11, 2015, adding another nurse and various Pinnacle Health entities as defendants. Rhoads ultimately discontinued that action.

On June 30, 2017, Defendants filed a Joint Motion to preclude expert testimony, and a brief in support thereof, asking the trial court to preclude Rhoads from presenting expert testimony that her obstetrical providers breached the standard of care by failing to order a C-section earlier based on EFM. Defendants argued, *inter alia*, that the use of EFM to predict and prevent newborn compartment syndrome is not generally accepted in the field of obstetrics. Defendants pointed out that EFM is generally used "to detect and prevent hypoxic-ischemic encephalopathy (HIE), an injury to the brain generally believed to be caused by respiratory compromise from lack of oxygen during labor." Joint Motion, 6/30/17, at 2.

Rhoads filed a Response and accompanying brief, asserting that L.A.C. should have been delivered earlier based on EFM to prevent HIE, and that by doing so, the compartment syndrome could have been prevented, or would have caused substantially less damage. Following a hearing on the matter, the trial court ultimately denied Defendants' Joint Motion on September 6, 2017.

Prior to trial, Dr. Cargado-Leynes and Women First jointly filed an Omnibus Motion *in limine* to preclude argument that earlier discovery of the change in fetal hand color (*i.e.*, from white to purple) as evidence of fetal distress would have necessitated an earlier C-section, as well as any argument about delay damages. The trial court denied the Motion.

Additionally, Defendants filed a Joint Motion *in limine* to preclude Rhoads from arguing that she did not consent to have care provided by Hoops or Dr.

Segrave-Daly. The trial court granted Defendants' Joint Motion *in limine* because Rhoads did not raise a lack of consent claim in her Complaint.

Defendants filed a Motion for Compulsory Nonsuit on September 14, 2017. Relevantly, Defendants argued that Hoops, individually, was entitled to a compulsory nonsuit, because Rhoads's standard-of-care expert was not qualified to express expert opinions as to Hoops, and Rhoads's counsel had conceded that Hoops, as a midwife, could not perform a C-section. The trial court granted Defendants' Motion for Compulsory Nonsuit at the close of Rhoads's case, indicating that Hoops could not order or perform a C-section, and while she potentially could have encouraged a physician to order a C-section, Rhoads had presented no testimony criticizing Hoops's failure to do so. ***See*** N.T., 9/14/17, at 715.

On September 15, 2017, the jury returned a verdict in favor of Defendants. The jury specifically found that neither Dr. Segrave-Daly nor Dr. Cargado-Leynes's conduct fell below the applicable standard of care.

Rhoads filed a timely Motion for Post-Trial Relief, and a brief in support thereof, requesting a new trial. Hoops and Dr. Segrave-Daly each filed a Response. Dr. Cargado-Leynes and Women First jointly filed a Response. The trial court denied Rhoads's Motion for Post-Trial Relief on January 17, 2018.

Rhoads filed a Notice of Appeal on February 2, 2018. Rhoads subsequently filed a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.[7]

On appeal, Rhoads raises the following issues for our review:

A. Whether the trial court erred in refusing to strike numerous jurors for cause when they stated they were patients of and/or had close relationships with one or more of the [D]efendants?

B. Whether the trial court erred by dismissing … Hoops[,] when [Rhoads] provided sufficient evidence to establish the necessary elements in the medical malpractice claim?

C. Whether the trial court erred by not giving an informed consent instruction when [Rhoads] asserted that she chose a particular practice and medical professionals[,] but instead was assigned a midwife and obstetrician from a different practice[,] who failed to order a C-section at 4:30 [p.m.] and delivery at 5:00 p.m.?

D. Whether the trial court erred by instructing the jury that it could not rely on "transient fetal hypoxia" to find that Defendants fell below the standard of care and/or was a factual cause of [L.A.C.]'s injuries[,] when [Rhoads's] expert testified that a C-section should have been ordered for [L.A.C.] at 4:30 p.m.[,] and delivery accomplished by 5:00 p.m., because of a pattern of late decelerations, and non-reassuring monitoring strips indicating fetal hypoxia?

E. Whether the trial court erred by failing to instruct the jury on "increased risk of harm" when evidence was presented to show

_____

[7] Defendants filed a Motion to Dismiss on May 31, 2018, claiming that Rhoads had failed to file her appellate brief by May 16, 2018, in accordance with this Court's April 6, 2018 Scheduling Order. Rhoads responded, indicating that she was not aware of the Scheduling Order, and requesting additional time to file her brief and designation of the reproduced record. On June 6, 2018, this Court entered an Order denying Defendants' Motion to Dismiss, and directing Rhoads to file her designation of the reproduced record within 10 days, and her brief and reproduced record within 30 days of the date of the Order. Rhoads timely complied.

that the Defendants' breach of the standard of care increased the risk of harm to [Rhoads]?

F. Whether the trial court erred by ruling on the objections of defense counsel without requiring the defense counsel to state a reason and giving [Rhoads's] counsel the opportunity to respond as required by the Rules of Evidence?

G. Whether the trial court erred by allowing the defense counsel to present facts not in evidence throughout trial and in closing[,] when doing so is in violation of case law and the Rule[s] of Professional Conduct?

Brief for Appellant at 4-5 (issued reordered; some capitalization omitted).

In her first claim, Rhoads argues that the trial court erred by refusing to strike numerous jurors for cause. *See* Brief for Appellant at 17-21. Rhoads identifies multiple jurors (specifically, jurors 44, 46, 70, 144, 162, 189, 201, 243, 251, 307, 361, and 405) who were patients of Woodward or Women First, or who had worked with Dr. Segrave-Daly or Hoops. *Id.* at 19-20. Rhoads claims that each of those jurors should have been stricken for cause, and that the trial court failed to do so. *Id.* at 20. Rhoads acknowledges that only jurors 307 and 405 were seated on the jury. *Id.* However, Rhoads argues that because the trial court did not strike all of the above-mentioned jurors for cause, she "was forced to use her preemptory [*sic*] challenges to strike as many of the biased potential jurors as she could." *Id.*

> Our review of a trial court's decision to disqualify a juror based upon that juror's relationship with the parties, counsel, victims, or witnesses depends upon whether the relationship is sufficiently close that we presume the likelihood of prejudice under the first scenario, or whether the juror reveals a likelihood of prejudice through conduct and answers to questions under the second scenario.

*Shinal v. Toms*, 162 A.3d 429, 441 (Pa. 2017). Because Rhoads challenges these jurors based on their relationship to Defendants, we "will review the trial court's determination for an error of law. Our review of a questions of law is *de novo*, and the scope of our review is plenary." *Id.* (citation omitted); *see also Tucker v. Cmty. Med. Ctr.*, 833 A.2d 217, 225 (Pa. Super. 2003) (stating that "[t]he decision to grant or deny a challenge for cause for a juror in a close relationship with either of the parties in a case is a question of law and is subject to ordinary review."). Additionally, "[t]he mere existence of some familial, financial, or situational relationship does not require dismissal in every case. A remote relationship to an involved party is not a basis for disqualification where a prospective juror indicates during *voir dire* that he or she will not be prejudiced." *Shinal*, 162 A.3d at 443 (citation and quotation marks omitted).

The trial court addressed Rhoads's first claim as follows:

[Rhoads] waived [her] right to object to any jurors other than juror numbers 201, 144, 70 and 46. In order to preserve the issue of a juror's alleged bias, [Rhoads's] counsel was required to make a timely and specific objection at the appropriate stage of the proceedings before this [c]ourt. *Tindall v. Friedman*, 970 A.2d 1159, 1174 (Pa. Super. 2009) (citations omitted). Failure to do so results in a waiver of that issue because it does not call the claim to the court's attention at a time when the alleged error could have been corrected. *Id.* During jury selection, it was certain that any requests to strike for cause that were not clear-cut cases were to be held until the end of jury selection. At the end of jury selection, the attorneys were called up for a sidebar conference to discuss the exact jurors that [Rhoads was] seeking to strike for cause. [Rhoads's] counsel only mentioned juror numbers 201, 144, 70 and 46.[FN] After those requests were denied, this [c]ourt specifically asked [Rhoads's] counsel if there

- 10 -

were any other requests to strike for cause, and [Rhoads's] counsel said no. As such, [Rhoads's] counsel has waived the issue for all but those four specified jurors.

With respect to the four specified jurors, it is irrelevant that this [c]ourt did not strike them for cause because each of those four jurors was so far down on the list of potential jurors that a full jury with alternates had been picked before the parties reached those jurors. As such, [Rhoads] did not have to use a preemptory [*sic*] challenge for any of those four jurors, and none of those four jurors sat on the jury panel. As such, any perceived error would be harmless.

Regardless of the above, there is no case law that holds that a person who is or was a patient at a defendant medical practice must be stricken for cause. Rather, the test is that a juror must have a "**close** familial, financial, or situational relationship with a participant in the litigation." **Shinal**[, 162 A.3d] at 443 (emphasis added). [The trial court does] not believe that a patient at a medical practice[,] who has never been treated by one of the [d]efendant doctors[,] constitutes a close situational relationship. Rather, that constitutes the mere existence of **some** situational relationship, which simply requires a [j]udge to ask if the potential juror can be fair and unbiased, given their relationship. Each of the identified jurors testified that they could be fair and unbiased, and this [c]ourt was within its discretion to believe that testimony. Thus, we conclude that it was not error for this [c]ourt to refuse to strike certain jurors for cause.

---

[FN] The specific exchange went as follows:

THE COURT: We'll start with the Plaintiff. Is there any other requests to strike for cause?

ATTORNEY ANGINO: Your Honor, my request is that the people who had been patients for either of these practices, even if they weren't treated by the particular individuals, should be stricken for cause.

THE COURT: Well, just so the record's clear, what juror numbers are you referring to?

ATTORNEY ANGINO: I didn't mark them down. As we went through them, I specifically mentioned them, your Honor.

THE COURT: I need to know the numbers because there may be a difference in how they responded to the question.

ATTORNEY ANGINO: Your Honor, 201, patient at Woodward; 106 [Hoops] delivered her kids.

ATTORNEY PIPA: She's already been stricken.

ATTORNEY ANGINO: Okay. 144, employee and worked with [Dr. Segrave-Daly]; 70, patient at Woodward; 46, patient at Woodward. (N.T.[, 9/11/17, at] 79-80).

Trial Court Opinion, 1/17/18, at 2-4 (footnote in original). Because we agree with the trial court's determinations, Rhoads is not entitled to relief on this claim.

In her second claim, Rhoads contends that the trial court erred by dismissing Hoops, where Rhoads had provided sufficient evidence to establish the necessary elements of a medical malpractice claim. *See* Brief for Appellant at 24-28. Rhoads asserts that her standard-of-care expert, Jill Mauldin, M.D. ("Dr. Mauldin"), "spent significant time explaining how midwife Hoops and the other defendants fell below the standard of care by misreading EFM strips and other signs and in failing to request and order a C-section delivery in a timely fashion." *Id.* at 26-27. Rhoads claims that Dr. Mauldin's criticisms of Defendants are based on the applicable standard of care, rather than her professional opinion. *Id.* at 27. Rhoads claims that even though Hoops could not order a C-section herself, she should have notified another physician to do so. *Id.* at 27-28.

Initially, we note that Rhoads failed to identify the specific portions of Dr. Mauldin's testimony, which she believes support her claim against Hoops. Additionally, Rhoads baldly states that "Dr. Foley connected the breach in standard of care to causation[,]" without providing a discussion of any relevant portions of Dr. Foley's testimony. *See* Pa.R.A.P. 2119(c). Instead, Rhoads simply points us to portions of her Reproduced Record, spanning nearly 100 pages of testimony from Dr. Mauldin and Dr. Foley.

Further, as the trial court states in its Opinion, Dr. Mauldin was not offered as an expert on midwifery. *See* Trial Court Opinion, 1/17/18, at 5. Rather, Rhoads's counsel specifically identified Dr. Mauldin as an expert in obstetrics and gynecology. *See* N.T., 9/12/17, at 208. On cross-examination, Dr. Mauldin acknowledged that she was not trained as a midwife. *See id.* When asked whether she considered herself an expert in midwifery, Dr. Mauldin responded that she believed herself to be "an expert in knowing how physicians should interact with midwives and how we interact on the labor and delivery unit and what expectations are." *Id.* at 209.

> Dr. Mauldin was not asked any questions on [] Hoops's interaction with Dr. Segrave-Daly. Moreover, Dr. Mauldin's ultimate opinion was that a C-section should have been ordered no later than 4:30 p.m., and that it was a breach of the standard of care not to do so. It is undisputed that [] Hoops cannot order a C-section. As such, there was no expert testimony that [] Hoops breached the standard of care, and compulsory non-suit in her favor was proper.

Trial Court Opinion, 1/17/18, at 5-6. Our review of the record confirms that Dr. Mauldin did not testify that Hoops should have notified another physician

to order a C-section. Accordingly, the trial court's determination that Rhoads failed to present sufficient evidence that Hoops had breached the standard of care is supported by the record. Thus, the trial court did not err in granting a nonsuit in Hoops's favor.

In her third claim, Rhoads asserts that the trial court erred by failing to give the jury an informed consent instruction, where "she chose a particular practice and certain medical professionals[,] but instead was issued a midwife and obstetrician from a separate practice who failed to order a C-section at 4:30 and delivery at 5:00 p.m." Brief for Appellant at 21. Rhoads claims that "[i]mplicit within the doctrine of informed consent is the right of a patient, except in an emergency, to choose the practice and the doctors, not a midwife, to make the critical decisions as to their care and treatment." *Id.* at 21-22. Rhoads directs our attention to Section 504 of the MCARE Act, 40 P.S. § 1303.504,[8] and argues that the Legislature has expanded the applicability of the informed consent doctrine. Brief for Appellant at 22. Rhoads states that a C-section requires a patient's informed consent because it is a surgical procedure under Section 504, and contends that informed consent should

_____

[8] Section 504 provides, in relevant part, as follows:

**(a) Duty of physicians.**--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

   (1) Performing surgery, including the related administration of anesthesia.

40 P.S. § 1303.504(a)(1).

include a patient's right to choose and consent to the physician performing the C-section. ***Id.*** at 23-24. Additionally, Rhoads concedes that she did not specifically raise a claim of informed consent in her Complaint, but argues that Defendants were aware that she intended to pursue such a claim. ***Id.*** at 24.

> In examining jury instructions, our scope of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. An erroneous charge provides grounds for a new trial if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse a material issue. Our examination of a trial court's charge to the jury includes a review of the charge in its entirety. Because this is a question of law, [an appellate court's] review is plenary.

***Shinal***, 162 A.3d at 452.

The trial court addressed Rhoads's third claim as follows:

[Rhoads] argue[s] that [she] specifically picked [] Women First for her obstetrical care and ultimate labor and delivery[,] and did not consent to treatment from doctors and midwives from [] Woodward …. Prior to the start of trial, Defendants filed a [J]oint [M]otion to preclude [Rhoads] from arguing a cause of action based on breach of informed consent, which was granted.

It is undisputed that [Rhoads] did not make a claim for breach of informed consent in any of the Complaints [she] filed, and [Rhoads] admit[s] this. … Moreover, a review of the Complaints that have been filed do not include any allegations that could be amplified to establish a claim for breach of informed consent. As such, [Rhoads's] attempt to introduce evidence on informed consent shortly before the start of trial constitutes a material variance from the pleadings that was barred by the statute of limitations. In a post-argument submission, [Rhoads's] counsel argues that this case involves a minor, and the statute of limitations does not begin to run until [L.A.C.] has reached the age of eighteen. However, the claim for breach of informed consent is not [L.A.C.]'s claim to make. Rather, it is [] Rhoads's claim to make, and thus began to run on September 27, 2012. Therefore, [] Rhoads's purported claim for breach of informed

consent expired prior to the time when [her] counsel first sought to make a claim for same, and it was not error for [the trial c]ourt to deny [Rhoads's] attempt to introduce evidence of an untimely claim.

Trial Court Opinion, 1/17/18, at 4-5 (footnotes omitted). Because Rhoads, by her own admission, failed to raise a claim regarding lack of informed consent in her Complaints, the trial court properly granted Defendants' Joint Motion *in limine* on the matter, and did not err in declining to charge the jury on informed consent.[9]

Rhoads next claims that the trial court erred by instructing the jury that it could not rely on transient fetal hypoxia to find that Defendants fell below the standard of care, and that the transient fetal hypoxia was a factual cause of L.A.C.'s injuries. Brief for Appellant at 28. Rhoads argues that hypoxia was

---

[9] We further note that the physician who performed Rhoads's C-section, Dr. Cargado-Leynes, was employed by Women First. *See* N.T., 9/13/17, at 526. Additionally, Dr. Cargado-Leynes, Hoops, and Dr. Segrave-Daly each testified that Women First and Woodward have a collaborative arrangement, whereby the two practices share responsibilities and patients. *See id.* at 526 (wherein Dr. Cargado-Leynes testified that "[w]e are a practice who cross-covers with Woodward & Associates. That has been our arrangement for years, even before my joining the group."); *id.* at 499 (wherein Hoops stated that Woodward "collaborate[s] with Women First [], and so we care for their patients and they care for ours. We take turns doing call."); *see also* N.T., 9/15/17, at 869-70 (wherein Dr. Segrave-Daly testified that "each of our practices employ both physicians who perform obstetrics … and midwives. And in order to facilitate the care of both of our patients and still be able to care for patients in the office, even prior to my arrival here in 2007, there was a collaborative arrangement between the two practices which allowed for alternative call between the two practices."). Dr. Cargado-Leynes specifically testified that medical providers at Women First explain the arrangement to all of their patients. *See* N.T. 9/13/17, at 526-27 (wherein Dr. Cargado-Leynes testified that "[w]e make them understand that we cross-cover and what that means is that when we are -- we share our call, basically, so they may not necessarily get the doctor they've been seeing.").

the principal basis for Dr. Mauldin's testimony that Defendants had breached the standard of care by not delivering L.A.C. sooner. *Id.* at 29. Rhoads also contends that "[b]y stating that [] Rhoads could not recover damages for transient hypoxia, without any further instruction, it's clear that the jury believed they couldn't find that Defendants fell below the standard of care for causing the transient hypoxia." *Id.* Rhoads asserts that L.A.C. suffered transient hypoxia, which is proof that he was delivered late. *Id.* at 30.

With the exception of one cursory citation to the elements of a medical malpractice claim, Rhoads fails to cite to any relevant legal authority in support of her claim. *See* Pa.R.A.P. 2119(a) (stating that the argument shall include "such discussion and citation of authorities as are deemed pertinent."). Accordingly, Rhoads's fourth claim is waived. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) (stating that "arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." (internal citation omitted)).[10]

In her fifth claim, Rhoads asserts that the trial court erred by failing to instruct the jury on increased risk of harm. *See* Brief for Appellant at 30-34. Rhoads points out that Defendants' theory of the case was based on an

---

[10] Even if Rhoads had properly developed this claim for our review, we would agree with the trial court's determination that its jury instruction was appropriate. *See* Trial Court Opinion, 1/17/18, at 6 (noting that the challenged instruction "came during the damages section of the instructions and makes two specific references to damages, and none to standard of care or factual cause.").

inability to pinpoint exactly when L.A.C.'s compartment syndrome developed, and argues that Defendants' negligence, at a minimum, increased the risk of harm. *Id.* at 32. Rhoads contends that the pressure causing the compartment syndrome occurred during the birthing process, and that failing to deliver L.A.C. by C-section earlier increased the risk of harm. *Id.* Rhoads claims that Dr. Foley and "[a]ll of the experts" agreed that the location of the fetal hand next to the vertex for an extended period created pressure. *Id.* at 33. According to Rhoads, "the jury clearly took into consideration the causation element when it decided the breach element." *Id.*

Again, Rhoads cites only to an expansive range of testimony from Dr. Foley in support of her assertion that Dr. Foley had opined that the compartment syndrome "definitely occurred during the birth process." *Id.* at 33. Rhoads also references an agreement among "[a]ll of the experts" regarding the cause of the pressure without identifying those individuals or citing to any additional relevant testimony. *See* Pa.R.A.P. 2119(c); *see also* *B.G. Balmer & Co. v. Frank Crystal & Co.*, 148 A.3d 454, 468 (Pa. Super. 2016) (stating that this Court "will not scour the record in order to find support for statements made by litigants in their briefs.").

As the trial court stated,

> [Rhoads's] counsel did not ask their expert any causation questions. Thus, [Dr. Mauldin] never testified that the Defendants' conduct increased the risk that [L.A.C.] would sustain compartment syndrome. [L.A.C.]'s treating physician, [Dr. Foley], who testified about causation of compartment syndrome, did not testify that any of the Defendants' conduct increased the

risk of harm that [L.A.C.] would sustain compartment syndrome. Furthermore, [Rhoads did] not cite to any testimony that supports [her] argument that there was competent expert testimony to support an instruction on increased risk of harm. Thus, there was no expert testimony on increased risk of harm, and [Rhoads was] not entitled to a jury instruction on the same.

Trial Court Opinion, 1/17/18, at 7. As Rhoads failed to identify any specific testimony contrary to the above reasoning, and we discern no abuse of discretion or error by the trial court, Rhoads is not entitled to relief on this claim.

In her sixth claim, Rhoads argues that the trial court erred by ruling on Defense counsel's[11] objections, without first requiring Defense counsel to state a reason for the objection and allowing Rhoads's counsel to respond. **See** Brief for Appellant at 34-35.

Rhoads failed to include any citations to the trial transcripts,identify even one example of an erroneous ruling by the trial court following an objection. **See** Pa.R.A.P. 2119(a), (c). As this issue is not adequately developed for our review, it is waived. **See Lackner, supra**; **B.G. Balmer & Co., supra**.

In her final claim, Rhoads contends that the trial court erroneously allowed Defense counsel to present facts not in evidence throughout trial and during closing arguments. **See** Brief for Appellant at 35-37.

Rhoads does not identify any particular facts, not in evidence, that were presented to the jury by any of Defendants' counsel, nor did Rhoads provide

_____

[11] Rhoads does not specify which of Defendants' counsel were responsible for these purported errors.

specific citations to the trial transcripts in support of her claim.  ***See*** Pa.R.A.P. 2119(a), (c).  Thus, because her final claim is not adequately developed for our review, it is waived.  ***See Lackner, supra***; ***B.G. Balmer & Co., supra***.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/23/2019