IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Braulio Rivera,                                  :
        Petitioner                             :
                                                 :     No. 1487 C.D. 2022
        v.                                     :
                                                 :     Submitted: December 4, 2023
Unemployment Compensation Board                  :
of Review,                                       :
        Respondent                             :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE DUMAS                      FILED: February 20, 2024

Braulio Rivera (Claimant) has petitioned this Court to review the adjudication of the Unemployment Compensation Board of Review (Board), entered September 6, 2022, which affirmed the decision of a Referee to deny Claimant unemployment compensation (UC) benefits.[1] The Board concluded that Claimant is ineligible for UC benefits under Section 402(e) of the Unemployment Compensation Law (Law)[2] because he was discharged from work for willful misconduct. We affirm the Board's order.

---

[1] Claimant commenced this appeal *pro se*. At some point prior to briefing, Claimant obtained counsel. *See* Appl. for Extension of Briefing Schedule, 6/15/23.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law provides that an employee shall be ineligible for UC for any week in which his unemployment is due to his discharge from work for willful misconduct. 43 P.S. § 802(e).

# I. BACKGROUND[3]

Beginning in December 2019, Claimant was employed fulltime as a maintenance technician for Housing Development Corporation of Lancaster County (Employer). His duties involved providing maintenance and service inside the apartments of elderly residents of an 80-unit complex. Effective November 1, 2021, and following 60 days' notice, Employer adopted a COVID-19 policy, which required its employees to get vaccinated or self-test for the virus weekly and submit the results before reporting for work each Monday. Employer provided test kits or reimbursed employees for the cost of the test kits.

Claimant requested an exemption from the policy on religious and constitutional grounds, but Employer denied that request. Claimant refused to comply with the policy and was thereafter terminated by Employer on November 11, 2021.

Claimant applied for UC benefits, which were denied pursuant to Section 402(e) of Law. Claimant appealed to the Referee, who held an evidentiary hearing on June 22, 2022. Claimant appeared *pro se* and conceded that he was aware of the vaccination policy but contended that he was entitled to a religious exemption from both vaccination and testing. For its part, Employer provided testimony from Kimberly Fletcher, Vice President and Chief People Officer, who detailed the institution of the policy and Employer's concerns regarding the health and safety of its residents.

The Referee determined that Employer's directive was reasonable, that Claimant did not have a sincerely held religious belief regarding vaccination or testing, and that Claimant had committed willful misconduct by failing to comply.

---

[3] Unless otherwise stated, we base the statement of facts on the decision of the Board, which is supported by substantial evidence of record. *See* Bd. Dec. & Order, 9/6/22, at 1-2.

Claimant appealed to the Board, which affirmed the Referee, also concluding that Employer's directive was reasonable, that Claimant had failed to articulate a sincerely held religious belief, and that he had accordingly committed willful misconduct by failing to comply with the directive. *See* Bd.'s Decision and Order, 9/6/22, at 2-4. Claimant then appealed to this Court.

## II. ISSUES

On appeal, Claimant disputes the reasonableness of Employer's policy. *See* Claimant's Br. at 4. He further contends that he had good cause for his refusal to comply with the policy. *See id.*

## III. DISCUSSION[4]

### A. Employer's Policy was Reasonable

Claimant baldly asserts that the testing requirement is unreasonable because it infringes upon his medical privacy. *See* Claimant' Br. at 8-11. According to Claimant, a positive result could expose him to stigma and potential prejudice. *See id.* As a result, Claimant concludes, Employer cannot establish willful misconduct.[5] *See id.*

---

[4] "This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence." *See Gordon Terminal Serv. Co. v. Unemployment Comp. Bd. of Rev.*, 211 A.3d 893, 898 (Pa. Cmwlth. 2019) (citing Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704). Substantial evidence is relevant evidence that a reasonable person may accept as adequate to support a finding. *Pierce-Boyce v. Unemployment Comp. Bd. of Rev.*, 289 A.3d 130, 136 (Pa. Cmwlth. 2022).

In UC cases, the Board is the ultimate fact-finder and resolves issues of credibility and conflicting evidence. *Pierce-Boyce*, 289 A.3d at 135. This Court is bound by those findings, provided they are supported by substantial evidence. *See id.* at 136. However, "[w]hether or not an employee's actions amount to willful misconduct is a question of law subject to review by this Court." *Gordon Terminal Serv. Co.*, 211 A.3d at 898 (citation omitted).

[5] Due to Claimant's failure to meaningfully develop this argument and failure to support it with citation to relevant legal authority, he risks waiver. *See Ruiz v. Unemployment Comp. Bd. of*

3

In response, the Board asserts that Employer's policy was reasonable, that Claimant was aware of the rule, and that Claimant subsequently violated the rule. *See* Bd.'s Br. at 6-9. The Board contends that the vaccination or testing was necessary to protect the health and safety of Employer's elderly residents, and that the rule was fair, just, and appropriate to pursue that legitimate interest. *See id.* at 8. Additionally, the Board noted Employer's reasonable accommodation of weekly testing in lieu of requiring vaccination. *See id.* at 8-9.

Willful misconduct is defined as (1) wanton and willful disregard of an employer's interests; (2) deliberate violation of an employer's rules; (3) disregard of behavioral standards that an employer can rightfully expect from an employee; or (4) negligence showing an intentional disregard of the employer's interests or the employee's duties and obligations. *Pierce-Boyce*, 289 A.3d at 135. An employer must prove the existence of a work rule, the reasonableness of the rule, the claimant's knowledge of the rule, and the claimant's subsequent violation of the rule. *Id.* at 136.

"In determining reasonableness, this Court should consider whether application of the rule or policy under the circumstances is fair and just and appropriate to accomplish a legitimate interest of the employer." *Spirnak v. Unemployment Comp. Bd. of Rev.*, 557 A.2d 451, 453 (Pa. Cmwlth. 1989); *see also Brown v. Unemployment Comp. Bd. of Rev.*, 276 A.3d 322, 328-29 (Pa. Cmwlth. 2022) (holding that a children's hospital has a legitimate interest in protecting the

*Rev.*, 911 A.2d 600, 605 n.5 (Pa. Cmwlth. 2006) ("When issues are not properly raised and developed in a brief, or when the brief is inadequate or defective because an issue is not adequately developed, this Court will not consider the merits of the issue."); *see also* Pa.R.A.P. 2119(a). Nevertheless, because we may discern the argument he attempts to raise on appeal, we decline to find waiver in this instance.

health and safety of its patients and may make business decisions requiring employees to be vaccinated yearly against the flu).

Employer provided testimony that it required *either* vaccination *or* weekly testing because the COVID-19 pandemic was a serious health and safety issue, and it needed to protect its vulnerable elderly residents as well as its employees. *See* Notes of Testimony (N.T.), 6/22/22, at 11. Employer never required vaccination; employees who objected to vaccination on religious or medical grounds could, instead, submit to weekly swab testing. *See id.* at 12-13.

The Referee and the Board both determined that Employer's directive was reasonable given the nature of the COVID-19 virus and the vulnerability of its elderly residents. *See* Ref.'s Order, 6/23/22, at 2; *see also* Bd.'s Dec. & Order, 9/6/22, at 2-4. Additionally, the Board concluded that periodic testing for COVID-19 was a reasonable accommodation for employees who objected to vaccination on religious grounds. *See* Bd.'s Dec. & Order at 2.

As an administrator of housing for elderly residents, Employer has a legitimate interest in protecting their health and safety, as well as the health and safety of its employees, during a pandemic. *See*, *e.g.*, *Brown*, 276 A.3d at 328-29. Employer made a business decision requiring either testing or vaccination to accomplish that goal. *Brown*, 276 A.3d at 329. This was fair, just, and appropriate under the circumstances to accomplish this legitimate interest. *See Spirnak*, 557 A.2d at 453. Accordingly, neither the Referee nor the Board erred in determining that the policy was reasonable and Claimant's failure to comply constituted willful misconduct.[6] *See Gordon Terminal Serv. Co.*, 211 A.3d at 898.

_____

[6] Claimant does not challenge the other elements required to prove a *prima facie* case of willful misconduct, namely, the existence of a work rule, the claimant's knowledge of the rule, and the claimant's subsequent violation of the rule. *Pierce-Boyce*, 289 A.3d at 136.

## B. Claimant Failed to Establish Good Cause

Claimant asserts that he had good cause to violate Employer's policy. *See* Claimant's Br. 9. According to Claimant, the vaccines available "had only received emergency authorization from the [United States Food and Drug Administration.]" *Id.* Therefore, Claimant continues, "[i]t is undisputed that the fear of ill effects . . . [are] widespread . . . among citizens of the United States . . . ." *Id.* Finally, Claimant states that the vaccines available "entail serious health risks," although he concedes that the "frequency of those risks is low." *Id.* For these reasons, Claimant believes that his vaccine refusal is "*per se* reasonable." *Id.*

Claimant also contends that he had good cause for refusing to submit to COVID-19 testing. *See id.* at 10. According to Claimant, COVID-19 was "a feared disease known to potentially cause long-term illness," and that the weekly testing requirement infringed upon his medical privacy and exposed him to "stigma and potential prejudice."[7] *Id.*

For its part, the Board rejects Claimant's argument that he had good cause for refusal to submit to either vaccination or testing. *See* Bd.'s Br. at 9-10 (citing in support *Brown*, 276 A.3d at 322).[8] The Board asserts that Claimant had an obligation to comply with the employer's reasonable directives related to the health

---

[7] Claimant has abandoned any argument regarding his request for a religious exemption. *See generally* Claimant's Br. In its decision, the Board noted that it was prohibited from denying unemployment compensation benefits based on the First Amendment, U.S. CONST. amend. I, right to free exercise of religion. *See* Bd.'s Dec. and Order, 9/6/22, at 3. However, the Board determined that Claimant had not articulated how his beliefs regarding the vaccination and testing were in any way connected to his religion or faith. *See id.* Accordingly, the Board found this explanation not credible. *See id.* Claimant had failed to elaborate on the foundation of his belief, and his sole explanation—concern about the effects of vaccination or testing—was a non-religious or medical concern. *See id.* at 4.

[8] In *Brown*, this Court held that a flu vaccine policy is fair and just where it allows medical or religious exemptions, even where the employer had rejected a form document submitted by the claimant asserting her right not to give consent. *Brown*, 276 A.3d at 328-29.

and safety of its communities, and that he chose not to comply even though he was informed his failure to comply would lead to termination. *See id.* at 10-11.

Once an employer establishes that an employee committed willful misconduct, the burden shifts to the employee to establish good cause for his actions. *Woodring v. Unemployment Comp. Bd. ofac Rev.*, 284 A.3d 960, 964 (Pa. Cmwlth. 2022). "The employee can establish good cause where his actions are justified or reasonable under the circumstances." *Id.* (internal quotations omitted). Courts evaluate whether good cause existed for an employee's actions by considering all the attendant circumstances. *Halloran v. Unemployment Comp. Bd. of Rev.*, 188 A.3d 592, 597 (Pa. Cmwlth. 2018). It is the claimant's burden of proof to show that his actions were justifiable or reasonable. *See Arbster v. Unemployment Comp. Bd. of Rev.*, 690 A.2d 805, 809 (Pa. Cmwlth. 1997).

An employee does not commit willful misconduct if his employer's directive directly threatens the employee's health or safety. *Dougherty v. Unemployment Comp. Bd. of Rev.*, 686 A.2d 53, 54 (Pa. Cmwlth. 1996). However, a claimant's subjective beliefs alone do not establish good cause for failing to comply with an employer's directive. *Id.* at 55.

Instantly, Claimant has vaguely alluded to "ill effects" and "serious health risks" but failed to describe them more specifically. *See id.* At best, with regard to testing, Claimant has offered speculative claims regarding "stigma" that he could potentially suffer if he was diagnosed with COVID-19. *See* Claimant's Br. at 8-9. He has failed to support these bald assertions with any evidence. *See generally* N.T. The Board did not credit these assertions, and on this record, we will defer to the Board's findings. *See* Bd.'s Dec. & Order at 2-3; *see Pierce-Boyce*, 289 A.3d at 136.

7

Under these circumstances, Claimant's subjective beliefs do not support his refusal to abide by Employer's policy. *See Dougherty*, 686 A.2d at 55. His refusal was neither justified nor reasonable. *See id.* Thus, he failed to establish good cause for his misconduct. *See Woodring*, 284 A.3d at 964.

## IV. CONCLUSION

Because Employer's policy was reasonable and because Claimant failed to establish good cause for his failure to comply with this policy, the Board appropriately found that he was disqualified for UC benefits under Section 402(e). *See Brown*, 276 A.3d at 328-29; *Woodring*, 284 A.3d at 964; *Dougherty*, 686 A.2d at 55; *Spirnak*, 557 A.2d at 453. Accordingly, we affirm.

_____
LORI A. DUMAS, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Braulio Rivera,                          :
                    Petitioner           :
                                         :   No. 1487 C.D. 2022
             v.                          :
                                         :
Unemployment Compensation Board          :
of Review,                               :
                    Respondent           :

# **O R D E R**

AND NOW, this 20th day of February, 2024, the order of the Unemployment Compensation Board of Review, entered September 6, 2022, is AFFIRMED.

 

 

 

 

 

_____

LORI A. DUMAS, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Braulio Rivera,                          :
                Petitioner     :
                               :
            v.               :     No. 1487 C.D. 2022
                               :
Unemployment Compensation                :     Submitted: December 4, 2023
Board of Review,                         :
                Respondent     :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

DISSENTING OPINION
BY JUDGE McCULLOUGH               FILED: February 20, 2024


        Braulio Rivera (Claimant) did not comply with the Housing Development Corporation of Lancaster County's (Employer) COVID-19 policy for two reasons.  First, he expressed that he did not want to get the COVID-19 vaccine for medical reasons.  He **did not want to put something in his body where "the future effects on his body were unknown.**"  (Board's Decision and Order, September 6, 2022, Finding of Fact No. 7, at 3) (emphasis added).  Second, he expressed his concern that testing, and the results of that testing would violate his constitutional right to medical privacy.[1]

---

        [1] Claimant raised religious grounds as a reason for noncompliance below, but the Unemployment Compensation Board of Review (Board) rejected this as not credible and not supported by the facts.  The Board also held that Claimant's beliefs amounted to non-religious concerns.  It explained that "[w]hen [C]laimant testified that he objected to both the COVID-19 vaccination and the testing because he did not know what could affect him down the road, **it amounted to a nonreligious concern/medical concern**, not a religious one."  (Board's Decision **(Footnote continued on next page…)**

**An Employee's Refusal to Get the COVID-19 Vaccine for Medical Reasons is not Willful Misconduct**

The Majority affirms the Board on the basis that Claimant's medical claims of safety and privacy were unfounded. (Majority Op. at 7.) For the reasons that follow, I must disagree.

"An employer seeking to prove willful misconduct by a policy violation must demonstrate the existence of the policy, its reasonableness, and its violation." *Klampfer v. Unemployment Compensation Board of Review*, 182 A.3d 495, 500 (Pa. Cmwlth. 2018). "The employer must also show that the [claimant] intentionally or deliberately violated" the policy. *Chester County Charter School v. Unemployment Compensation Board of Review*, 138 A.3d 50, 54 (Pa. Cmwlth. 2016). This Court must determine whether the policy at issue was reasonable and whether the claimant had good cause for violating it. *Klampfer*, 182 A.3d at 500. The claimant bears the burden of proving good cause by demonstrating that her conduct was justifiable and reasonable under the circumstances. *Kelly v. Unemployment Compensation Board of Review*, 747 A.2d 436, 439 (Pa. Cmwlth. 2000). In other words, if Claimant had good cause for his non-compliance with Employer's policy, it is not to be construed as willful misconduct. Without willful misconduct, Employer might still be able to terminate Claimant for non-compliance with a reasonable policy, but Claimant would not be denied unemployment compensation.

This case presents an example of the concerns that I articulated in my dissent in *Brown v. Unemployment Compensation Board of Review*, 276 A.3d 322, 333 (Pa. Cmwlth. 2022), wherein I explained that the citizens of this Commonwealth

_____

and Order at 3) (emphasis added). Claimant does not assert before this Court that the Board erred in this respect or that he had religious reasons for rejecting the vaccine and testing.

have a protected common law right to exercise autonomy over their medical treatment and asserting that legal right should not amount to willful misconduct or serve as the basis for denying one unemployment compensation benefits. As noted in my dissent in *Brown*, which I incorporate herein by reference, in Pennsylvania, courts have adopted the common law right to self-determination. Our Supreme Court has recognized this right and that it is the basis for the concept of informed consent. *Shinal v. Toms*, 162 A.3d 429, 452 (Pa. 2017) ("the right to be free from bodily invasion developed the doctrine of informed consent"). Specifically, and as also noted by the United States (U.S.) Supreme Court, "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others unless by clear and unquestionable authority of law." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891). In *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 269 (1990), then-Chief Justice Rehnquist stated that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body."

Here, Claimant was concerned that each available variety of the COVID-19 vaccine had only received emergency authorization from the U.S. Food and Drug Administration. The Board recognized Claimant's objection to the COVID-19 vaccination and testing because he did not want to "put something in [his] body that [he did not] know what it is" and "did not know what could affect [him] down the road." (Board's Decision and Order, at 3.)

"The goal of the informed consent doctrine 'is to provide the patient with material information necessary to determine whether to proceed with the given procedure or to remain in the present condition.'" *Sinclair by Sinclair v. Block,*

*M.D.*, 633 A.2d 1137, 1141 (Pa. 1993). "The doctrine presupposes that the patient has a choice to exercise." *Id.*

Here, with no consideration of a citizen's right to self-determination and informed consent, the Board summarily denied Claimant's medical claim, giving this issue short shrift, even appearing to belittle Claimant. Although the Board noted that Claimant did not want to put something into his body where the future effects on his body were unknown, it found he did not raise a sufficient medical claim. It is beyond cavil that experimental vaccines could pose unknown risks, as they had not been subjected to the stringent testing otherwise required for vaccines not permitted to market before completion of such testing. Pursuant to Section 360bbb-3 of the Federal Food, Drug, and Cosmetic Act, which governs emergency use authorization of medication, the Secretary of the U.S. Department of Health and Human Services may authorize the use of a drug that "is not approved, licensed, or cleared for commercial distribution under [Sections 355, 360(k), 360b, 360e, 21 U.S.C. §§ 355, 360(k), 360b, 360(e)]" where "**there is no adequate, approved, and available alternative**." 21 U.S.C. § 360bbb-3.[2] In other words, the

_____

[2] Section 360bbb-3(c) sets forth the criteria for issuance of an **authorization of the use of an unapproved a drug** in an emergency, as follows:

> **(c) Criteria for issuance of authorization**
>
> The Secretary may issue an authorization under this section with respect to the emergency use of a product only if, after consultation with the Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances described in subsection (b)(1)), the Secretary concludes--

**(Footnote continued on next page…)**

(1) that an agent referred to in a declaration under subsection (b) can cause a serious or life-threatening disease or condition;

(2) that, based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that--

> (A) the product may be effective in diagnosing, treating, or preventing--

>> (i) such disease or condition; or

>> (ii) a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act, [42 U.S.C. §§ 201-300aaa-13] for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and

> (B) the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;

(3) **that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition;**

(4) in the case of a determination described in subsection (b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and

(5) that such other criteria as the Secretary may by regulation prescribe are satisfied.

**(Footnote continued on next page…)**

PAM - 5

federal exemption from testing for drugs (including vaccines) provides that testing can be averted in an emergency, and if no remedy exists. Unquestionably, from the beginning differing medical opinions began to emerge concerning the current existence of claimed remedies, *e.g.*, Ivermectin, hydroxychloroquine, etc. But, the question before us here is not a scientific or medical one concerning the actual efficacy of other remedies, or the actual need for emergency vaccines to be sent to market. Quite simply, the straightforward question we address is whether the people, and in particular this Claimant, still have a right to medical autonomy, informed consent and self-determination.[3]

Indisputably, as noted above, there was and is conflicting information in the public domain, and considering such, or even without the existence of any conflicting information, Claimant sufficiently expressed his medical right not to take the COVID-19 vaccine as good cause for non-compliance with the policy. Whether it was his claim of lack of medical certainty as to what impact the untested vaccines would have on his person, or his desire to not have something injected into his body,[4]

---

21 U.S.C. § 360bbb (emphasis added).

[3] As it turns out, Claimant's concerns were not entirely unfounded. *See* Centers for Disease Control, Selected Adverse Events Reported after COVID-19 Vaccination, September 12, 2023 (detailing reports of anaphylaxis and Guillain-Barre Syndrome (GBS) after COVID-19 vaccination and reporting that the Johnson and Johnson/Janssen (J&J/Janssen) COVID-19 vaccination is no longer available in the United States due to higher than expected rates of GBS and Thrombosis with Thrombocytopenia Syndrome following the J&J/Janssen vaccination); Yale Medicine, May 17, 2023, The Link Between J&J's COVID-19 Vaccine and Blood Clots: What You Need to Know (reporting that the FDA put a pause on the J&J vaccine in 2021 after discovering life threatening blood clots associated with the vaccine.

[4] In fact, COVID-19 vaccine hesitancy is not uncommon in the U.S. population and globally. *See* G. Troiano, A. Nardi, Vaccine Hesitancy in the Era of COVID-19, Public Health, Volume 194, 2021; Time Trends, Factors Associated with, and Reasons for COVID-19 Vaccine Hesitancy: A Massive Online Survey of U.S. Adults from January-May 2021, King WC, **(Footnote continued on next page…)**

Claimant exercised his right to self-determination, medical autonomy and informed consent. As such, while it is clear that Claimant did not comply with Employer's policy to take a vaccine or testing requirements, he established sufficient good cause not to do so in exercising his right to self-determination. The question here is not whether an employer may terminate an employee for non-compliance with a reasonable policy, but whether in doing so when an employee has demonstrated good cause for non-compliance, the employee can be denied unemployment compensation for willful misconduct. In accordance with my dissent in *Brown*, I would conclude that because Claimant exercised his right to medical autonomy, informed consent and self-determinations as his reasons for non-compliance with Employer's policy, he cannot be construed to have committed willful misconduct.

### Refusal to Submit to Testing Without Assurances that Test Results Would Remain Private and Confidential is Not Willful Misconduct

Regarding Claimant's refusal to submit to testing, I agree with the Majority in general, that periodic testing of employees for COVID-19 has been recognized as a reasonable accommodation by employers for those employees who do not receive a vaccination. Because COVID-19 is recognized as contagious and presents potential health risks for the elderly, whose homes Claimant would enter to provide maintenance work for Employer, the Employer's testing alternative would not be deemed to be unreasonable on its face. Indeed, testing of employees who do not take the vaccine is recognized by the Equal Employment Opportunity

---

Rubinstein M, Reinhart A, Mejia R PLOS ONE 16 (12) (2021); L. Palamenghi, S. Barello, S. Boccia, and G. Graffigna, <u>Mistrust in Biomedical Research and Vaccine Hesitancy: the Forefront Challenge in the Battle Against COVID-19 in Italy</u>, Eur. J. Epidemiol., vol. 35, no. 8, pp. 785-788 (Aug. 2020).

Commission (EEOC) and Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, as an alternative accommodation. Other accommodations include wearing a face mask, working at a social distance from coworkers or non-employees, working a modified shift, and the opportunity to telework.

**However,** there are standards with which employers must comply in order to conduct such testing. Specifically, if an employer implements screening protocols that include COVID-19 viral testing, the ADA requires that any mandatory medical test of employees be "job-related and consistent with business necessity" based on relevant facts. Moreover, **an employer must keep all medical information**, **including results of testing**, vaccination information, an employee's temperature and symptoms, and the employee's COVID-19 diagnosis **confidential** and it must store it separately from their personnel files. *See* EEOC – Technical Questions and Answers-What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, *https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeoc-laws* (last visited February 16, 2024).

Here, Claimant argued before the Board that the testing was "against his constitutional rights" and the Board concluded that he was "afforded no First Amendment protections."[5] (Board Decision at 3.) Claimant expounds in his Brief

---

[5] Claimant has a constitutional right not to have his personal medical matters revealed. *See In re June 1979 Allegheny County Investigating Grand Jury*, 415 A.2d 73, 77-78 (Pa. 1980) ("The privacy interest of the patients . . . is the interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Constitution, art. 1, § 1 [Pa. Const. art 1, § 1], which provides, in pertinent part: 'All men . . . have certain inherent and indefeasible rights, among which are those . . . of acquiring, possessing, and protecting property and reputation . . . .' Disclosure of . . . medical data concerning the individual patient could, under certain circumstances, pose such a serious threat to a patient's right not to have personal matters revealed that it would be impermissible under either the United States Constitution or the Pennsylvania Constitution.")

that "Employer was infringing on [his] medical privacy and potentially exposing [him] to stigma and potential predudice (sic) should he test positive." (Claimant's Br. at 10.)

The Majority discounts Claimant's privacy concerns, stating that "[a]t best, with regard to testing, Claimant has offered speculative claims regarding the 'stigma' that he could potentially suffer if he was diagnosed with COVID-19." Majority Opinion, at 7. However, contrary to the Majority's reasoning, it was not necessary for Claimant to explain the stigma attached to a positive COVID-19 test any more than he did. A **COVID-19 viral test is a medical examination within the meaning established by the ADA**. It is beyond cavil that one's private medical information cannot be publicly disclosed. While the ADA and EEOC have established that testing is a reasonable accommodation for COVID-19 vaccines, the testing must be done **in accord with mandatory standards**.

Under our unemployment compensation law, once Claimant raised legitimate medical privacy concerns about Employer's testing, it was incumbent upon Employer to come forward with evidence that its policy complied with EEOC and ADA standards. The Board summarily denied Claimant's assertion that such testing violated his medical right to privacy without making any assessment on the record of whether Employer has policies and procedures in place that would protect Claimant's medical privacy rights in the results of the COVID-19 testing. As part of its determination of whether Claimant established good cause for non-compliance, the Board should have required Employer to show that its testing protocols complied with ADA guidelines. There is nothing in the record concerning what Employer does with the test results, who in Employer's organization would have access to such test results, procedures in place to maintain the confidentiality

of the results, or what assurances are given to employees that the test results would not be revealed to other employees or staff. The Board did not assess Employer's compliance with EEOC and ADA standards for such testing, nor does the Majority discuss this. I submit this was error. The Board's decision fell far short of analyzing necessary factors for testing, and for the medical exemption in general, resulting in a failure to ensure compliance with EEOC and ADA standards for testing. Unlike the Majority's view, I believe, like the ADA and EEOC, that Claimant's claim for privacy of the testing information is a valid concern. As already noted, the ADA considers such testing to be medical treatment. This right cannot be taken lightly in any scenario.

## CONCLUSION

In light of the above, and based on my dissent in *Brown*, Claimant's exercise of his rights to medical autonomy, self-determination, informed consent and privacy, provided good cause not to comply with Employer's mandate and should not be construed as willful misconduct. As such, I would reverse the Board and allow Claimant to receive unemployment compensation benefits. Accordingly, I must respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge